55 A.3d 680

**Konnyack A. THOMAS**

**v.**

**STATE of Maryland.**

**No. 130, Sept. Term, 2011.**

Court of Appeals of Maryland.

Oct. 26, 2012.

Ben Miller, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., of Maryland, Baltimore, MD), on brief, for respondent.

Argued by BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

In this case, we review the issue of the admissibility of a confession given in the absence of *Miranda* warnings.[1]

Konnyack Thomas, Petitioner, having been contacted by police, agreed to speak with the officers at the station. Prior to his arrival, he spoke with his estranged wife who informed Thomas that the police wanted to speak to him about accusations of sexual abuse made by their daughter against Thomas. When he arrived at the station, Thomas met with two detectives and spoke with them for approximately an hour and a half, during which he confessed to touching his daughter inappropriately and having intercourse with her. Thomas was arrested approximately twenty minutes after the interview concluded and was charged in the Circuit Court for Montgom-

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under *Miranda*, police are required, prior to any custodial interrogation, to inform a suspect that he or she has a right to remain silent, that any statement he or she does make can be used as evidence against him or her, and that he or she has the right to the presence of an attorney, either retained or appointed. *Id.* at 467–69, 86 S.Ct. at 1624–25, 16 L.Ed.2d at 720–21.

ery County with one count of sexually abusing a minor, two counts of second degree rape, and six counts of second degree sexual offense.

Prior to trial, Thomas filed a motion to suppress all of the statements he had made and argued that he had not been given *Miranda* warnings at the time he arrived at the police station, although he should have been. The circuit court judge agreed and suppressed the statements. The State appealed, pursuant to Section 12–302(c)(3)(i) of the Courts & Judicial Proceedings Article of the Maryland Code (1973, 2006 Repl. Vol.),[2] and the Court of Special Appeals reversed in a reported

---

**2.** Section 12–302(c) provides, in relevant part:

(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

\* \* \*

(3)(i) In a case involving a crime of violence as defined in § 14–101 of the Criminal Law Article, and in cases under §§ 5–602 through 5–609 and §§ 5–612 through 5–614 of the Criminal Law Article, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Maryland Constitution, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

(iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

(v) 1. Except as provided in subsubparagraph 2 of this subparagraph, pending the prosecution and determination of an appeal taken under paragraph (1) or (3) of this subsection, the defendant shall be released on personal recognizance bail. If the defendant fails to appear as required by the terms of the recognizance bail, the trial

opinion, *State v. Thomas*, 202 Md.App. 545, 33 A.3d 494 (2011), because they determined that Thomas was not in custody at the time he gave the statements at issue.[3] We granted Thomas's Petition for Certiorari, 425 Md. 227, 40 A.3d 39 (2012), to consider the following questions:

1. Is a person in custody for purposes of *Miranda* if, prior to questioning inside a police station, police have sufficient evidence to make an arrest and the person knows this, even if the police also tell the person "you are not under arrest"?

2. Did the Court of Special Appeals err when it found that petitioner was not in custody even though at the time petitioner was interrogated by police inside a police station he knew that his wife and daughter had told police that he had been sexually assaulting his daughter, police confronted him with this information, petitioner was noticeably having a "difficult time" prior to questioning, and police never told petitioner he was free to leave or that he did not have to cooperate with them and only told him he was not under

---

court shall subject the defendant to the penalties provided in § 5–211 of the Criminal Procedure Article.

2. A. Pending the prosecution and determination of an appeal taken under paragraph (1) or (3) of this subsection, in a case in which the defendant is charged with a crime of violence, as defined in § 14–101 of the Criminal Law Article, the court may release the defendant on any terms and conditions that the court considers appropriate or may order the defendant remanded to custody pending the outcome of the appeal.

B. The determination and enforcement of any terms and conditions of release shall be in accordance with the provisions of Title 5 of the Criminal Procedure Article.

(vi) If the State loses the appeal, the jurisdiction shall pay all the costs related to the appeal, including reasonable attorney's fees incurred by the defendant as a result of the appeal.

**3.** Thomas, in his brief before the Court of Special Appeals, also raised the issue of whether his statements should have been suppressed because they were made in reliance on a promise and were, thus, made involuntarily. The Court of Special Appeals declined to address this issue, however, because, "with no factual findings by the circuit court on the issue of voluntariness, the record is not adequate for review of the issue by this Court." *State v. Thomas*, 202 Md.App. 545, 581, 33 A.3d 494, 515 (2011). This issue was not presented in Thomas's Petition for Certiorari and we do not consider it.

arrest after petitioner was alone with two detectives in a closed room inside a police station?

■ We shall hold that a belief held by a suspect that police may have probable cause to arrest him or her is not sufficient to render the individual in custody for *Miranda* purposes. We shall further hold that the motion to suppress Thomas's statements should have been denied because, given the totality of the circumstances, Thomas was not in custody at the time he made the statements.

During the suppression hearing, the judge viewed a video, as well as admitted its transcript, of the police interrogation and Thomas's statements and heard testimony from Detective Kristie Thorpe, one of the detectives who interrogated Thomas; Thomas also testified on his own behalf. Thereafter, the judge made the following factual findings related to the events preceding Thomas's arrival at the police station: [4]

The facts are in this case as this Court finds them are that the detectives are, called the defendant to the station not to talk about the situation with his daughter. Notwithstanding, very good detective work initially, told him that he was invited down to the police station. Such invitations generally mean trouble, and this one did.

On the way to the police station the Court finds that the defendant's wife talked with him on the phone and gave him more information about what this really was about and this was about their daughter [C.] and his alleged sexual abuse of her. The defendant in this motions hearing took the stand and said that he thought initially that it might be about a runaway son until his wife informed him that it wasn't.

Now it's relevant in this case that the defendant, Mr. Thomas, is a sergeant in the United States Army. I think it's a reasonable inference that if the police want to talk to you about your children, and particularly when he finds out

---

4. We, like our colleagues on the Court of Special Appeals, shall refer to the minor victim only by her first initial, C.

that it's about his daughter, that a sergeant who is a supervisor in the United States Armed Forces does not want police detectives coming on the base to talk to him about sexually abusing his daughter. I think it's a reasonable inference.

So, certainly, he was going to go down to the police station to talk to them, as opposed to having them come to him.

With respect to what occurred when Thomas arrived at the police station, the judge found that the officers informed Thomas that he was not under arrest and the door was unlocked,[5] but did not tell Thomas he was free to leave:

Now, he gets to the police station and the detective tells him the following things. They greet him and they tell him it is a police station. It "doesn't look like" one, but it's a police station.

They tell him, "You are not under arrest," and that the door is unlocked. Now what does that mean? You're not under arrest and the door is unlocked.

If he was free to leave and he could get up and walk out if he wanted to, why didn't they just say that? Why stop by telling him, after telling him the door is unlocked?

Now for the record, the Court asked the State's Attorney, and she complied with the request, showed a portion of the CD of the interview. The Court observed that during the course of the interview the defendant is sitting on a sofa and

---

5. The dissent authored by Chief Judge Bell makes much of the fact that both parties, in their briefs, state that the outer door to the area in which the interrogation rooms were located had to have been opened with a key card when the detectives walked with Thomas into the interrogation room. Essentially, that dissent is arguing that Thomas was, in fact, locked in the interrogation room because one needed a key to exit the outer door, even if the door to the actual interrogation room was unlocked. This is problematic for two reasons. First, neither party asserts that a key card was needed to *exit* the outer door. More importantly, however, the trial judge's findings of fact are completely devoid of any mention of the outer door being locked, and the only statements regarding doors made by that judge were that they were *unlocked*.

he has two detectives sitting in front of him, the one asking most of the questions, Detective Thorpe, who testified here today; and Detective Birch, a male detective, is sitting also in front of him, but just a short, a great, a little further away.

They're polite. They're courteous. They're very respectful. They are detectives wearing plain clothes. But the detective never told him that he was free to leave.

The court then identified the "totality of the circumstances" test used to determine whether an individual is in custody for purposes of *Miranda* and explained that it requires an objective analysis of all the facts particular to the case at hand:

Now the State argues that the defendant was free to leave and the Court raises the question what reasonable person in a police interrogation room thinks that they can just get up and walk out? The Court, the issue is not whether they could, but whether a reasonable person would believe they could. And it's an objective standard as the Court said.

Now in an interview of one suspected of a crime by the police will have coercive aspects to it simply by virtue of the fact that they're the police and they're in the law enforcement system. And the Court said that in a case cited by the State, *Abeokuto v. State*, at 391 Md. 289 [893 A.2d 1018 (2006) ]. You know, inherently, if you're being interviewed by the police, and particularly in a police station, there is some coercive aspect to it.

The Court, in deciding whether an interrogation is custodial, must consider the totality of the circumstances on a case-by-case basis. Now, obviously, the State wants to argue the facts the way they see them. The Defense argues the facts the way he sees them and, but the Court must decide what the facts are as the apply, as the law applies to him in this case. And the Court considers all of the facts, not just the facts that the State wants the Court to consider or just the facts that the Defense wants the Court to consider.

The judge then considered the nature of interrogations that occur at police stations and stated that, although he did not believe the detectives intended to do anything inappropriate, "a system of subterfuge has developed in the law enforcement community with respect to interrogation techniques" and further opined that interrogations occurring at a police station are "inherently custodial" and professed disbelief that a person could confess to a serious crime such as murder or sexual assault and be allowed to leave:

The Court does not find that there was any intention by the detectives to do anything improper. However, a system of subterfuge has developed in the law enforcement community with respect to interrogation techniques.

The defendant was not at the station for a social visit. The detectives wanted to make this prosecution. They told the defendant he was not under arrest and the door was unlocked. It's a scary thought to think that in this community a citizen can walk into a police station, confess to a violent crime and then they are free to leave.

The State argues that a man who goes in and says that I was, I sexually abused my daughter can just leave. And that flies in the face of reason that you could go in and confess to a murder and just walk out of the station, you're not under arrest and you're not, and you're not in custody.

Now interrogations in police stations are inherently custodial whether they are coercively so or whether it's to the extent that it's violative of the requirements of Miranda is what these cases are all about. And that's why the Court must consider each factual situation on its own legs.

Each of the cases cited by counsel, both the State and the Defense, if you look at the facts, they're all different and that's why the cases are at the Appellate Court and that's why the opinions read as the way they do, read the way they do. Each case is different and this one is also.

Now interrogations of suspects in police stations are distinguishable from police encounters on the street. And there is a number of cases where police officers have

encountered people on the sidewalk, say "can I talk to you" or want to question an individual and the individual keeps walking and says "I don't have to talk to you" or something of this nature.

I don't know of any cases, as I said earlier, where a person just gets up and just walks out of a police station or feels that he can. What reasonable person would think that?

The judge then made additional findings of fact with respect to the interview room and the nature of the questions being asked, finding, specifically, that there were two detectives in the room, that the door was unlocked, that Thomas was told he was not under arrest but was not told he was free to leave, and that the questioning was designed to gather evidence rather than "to find out what happened":

Now, the Court considers the facts in this case further as follows. The defendant was being interviewed in the police station. The defendant was in a police interview room with two detectives, notwithstanding the fact that the door was unlocked as the defendant was told. He was also told that he was not under arrest. He was not told that he was free to leave.

The Court also considers that the questions that were being asked were specific not so much as to find out what happened. These questions weren't to find out what happened, simply to find out what happened. These questions were being asked to gather evidence. That's what the detectives were doing, they were gathering evidence.

What did you do? Where was she touched? When did it start? How many times did you do it? And the argument is that Miranda warnings should not have been given?

Parenthetically maybe a lawyer could have helped this family and this case, the State and the community. Given the facts in this case, that the State believes and it appears are strong facts, given the facts in this case, maybe a lawyer would have worked out a reasonable plea bargain for the

defendant and maybe this entire family would have been helped.

The judge then expressed skepticism regarding the State's arguments supporting the introduction of the statements, indicating that the detectives wanted to "get this guy for committing a horrible crime and they used this technique." The court noted that it believed *Miranda* warnings are frequently not given because those being interviewed request an attorney after being advised of their rights and police are prevented from getting further information:

The State claims that what they want to do is help the family. Well, maybe the family could have been helped by the legal community as opposed to, unfortunately we all know, and it's not necessary for me to go into it, what happened to this family and what will happen to this family after that, close parentheses.

The State has the burden to prove by a preponderance of the evidence that this was not a custodial interrogation, that those things that the State argues were accurate, that the defendant was free to leave and this was just a nice little conversation sitting on a nice, looks like soft, comfortable sofa sitting back just talking. They weren't sitting back just talking. They were building a case.

And they weren't trying to find out—This wasn't a whodunit. This was "You did it," we want to know what you did, when you did it, how many times you did it. Now law enforcement in this case would have been better served if the defendant had been read his Miranda rights and the court talks about that in *Argueta v. State,* which is at 136 Md.App. 273 [764 A.2d 863 (2001) ].

At the end of the day, this query remains, what is wrong with giving people their Miranda rights? And I'll tell you what's wrong with it. As soon as defendants are given their Miranda warnings, they often lawyer up. And when they lawyer up, they don't get the information that the detectives want to get.

As I said before, I don't find that there was any intention by these detectives to do anything improper. They were, they wanted to do what detectives do and what, you know, prosecutions in the system does. They wanted to get this guy for committing a horrible crime and they used this technique.

If they weren't going to give him, tell him completely what was going on, why did they tell him partially?

Now when the officer took the stand, and this was very telling, and I don't want to misquote her, but there was some suggestion in the beginning that she told him some certain things that she didn't tell him.

Mr. Gambrill argues that they probably usually tell them that they are free to leave, but she didn't do it this time. She just told him that the door was unlocked and why do that? Why say the door is unlocked if he's—why not just say "You're free to go, you're not in custody"?

The court then granted the Motion to Suppress, reasoning that no reasonable person would feel free to leave the room after confessing:

Well, at the end of the day, guess what? He was in custody. He was placed under arrest. And he was placed under arrest based upon the information that he had given to them without the benefit of Miranda warnings and he was in custody. This was a custodial interrogation. That no reasonable person would have thought they could get up and walk out of that room after they confessed to committing a violent crime.

That is just completely unreasonable to think that anybody would think they could go into a police station, sit down in an interrogation room, admit a violent crime and they're free to leave.

And I don't think any lawyer in this room really believes that a person can go in a police station and confess to a violent crime and say, "I'll see you later." That just isn't going to happen. It doesn't happen in the real world. And the technique of doing that ought to be stopped and this

message is sent. The motion to suppress that statement is granted.

■■■ Our review of a grant or denial of a motion to suppress is limited

to the record of the suppression hearing. The first-level factual findings of the suppression court and the court's conclusions regarding the credibility of testimony must be accepted by this Court unless clearly erroneous. The evidence is to be viewed in the light most favorable to the prevailing party. We "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case."

*State v. Tolbert,* 381 Md. 539, 548, 850 A.2d 1192, 1197 (2004) (internal citations omitted).

■■■ In its landmark decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that an individual in custody must be informed of certain rights prior to being interrogated so that he or she is not compelled into incriminating himself or herself in violation of the Fifth Amendment. *Id.* at 467–68, 86 S.Ct. at 1624–25, 16 L.Ed.2d at 720–21; *see also J.D.B. v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011); *Whitfield v. State,* 287 Md. 124, 131, 411 A.2d 415, 420 (1980) ("In this regard, we observe that statements which are obtained from a defendant during questioning conducted without the benefit of *Miranda* warnings, as concededly occurred here, need only be excluded from evidence if they 'flow from a custodial interrogation within the meaning of *Miranda,*'" quoting *Vines v. State,* 285 Md. 369, 374, 402 A.2d 900, 903 (1979)).

■■■ In analyzing whether an individual is in custody for *Miranda* purposes, we ask, under the "totality of the circumstances" of the particular interrogation, "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383, 394 (1995); *see also Owens v. State,* 399 Md. 388, 428, 924 A.2d 1072, 1095 (2007); *Whitfield,* 287 Md. at 141, 411 A.2d at 425. The "totality of

the circumstances test" requires a court to examine the events and circumstances before, during, and after the interrogation took place. *Owens,* 399 Md. at 428–29, 924 A.2d at 1095–96; *Whitfield,* 287 Md. at 140–41, 411 A.2d at 425. A court, however, does not parse out individual aspects so that each circumstance is treated as its own totality in the application of the law. Rather, when doing a constitutional analysis, a court must look at the circumstances as a whole. *Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901, 904 (2003) (stating that a court conducting a "totality of the circumstances test" must not "parse out each individual circumstance for separate consideration").[6]

In *Owens v. State,* 399 Md. 388, 924 A.2d 1072 (2007), one of our recent cases, we relied on our decision in *Whitfield v. State,* 287 Md. 124, 411 A.2d 415 (1980), in which we explicitly delineated those facts and events that are often relevant to this analysis. We noted that a court should consider the length and location of the interview, the number of police involved, restraint on the suspect, how the defendant got to the interview, and whether the suspect was arrested after the interview concluded:

> when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police

---

6. Much of Thomas's brief is devoted to the type of parsing out that is inappropriate in utilizing the "totality of the circumstances" test. Thomas, for example, refers to *Alvarado v. Hickman,* 316 F.3d 841 (9th Cir.2002) to argue that his being interviewed as a suspect indicates he was in custody, but he does not analyze the totality of the circumstances in *Hickman;* rather, he focuses exclusively on the issue of whether the person being interviewed was a suspect.

officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Owens*, 399 Md. at 429, 924 A.2d at 1095–96, quoting *Whitfield*, 287 Md. at 141, 411 A.2d at 425. These facts, of course, are not exhaustive, but do give a roadmap for a court to follow.

The suppression judge, however, while acknowledging the totality test, did not follow the roadmap provided in *Whitfield* and *Owens*. Rather, the judge based his conclusion that Thomas was initially in custody on the bases that Thomas was at the police station and that he later confessed. If confession is the trigger for custody, however, then each person who confesses in a police station must have been given *Miranda* warnings *per se*, which is without basis in *Miranda* jurisprudence. *See United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir.2008) (stating, in the course of considering whether Chee's confession at a police station rendered him in custody, that "[n]o Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation" (internal quotation marks and citations omitted)); *see also Locke v. Cattell*, 476 F.3d 46, 53 (1st Cir.2007) (stating that a confession does not automatically turn an interview into a custodial interrogation, when considering whether Locke was in custody after he confessed to a robbery while being interviewed at the police station); *Commonwealth v. Hilton*, 443 Mass. 597, 823 N.E.2d 383, 397 (2005) (stating that the defendant, who had confessed while at a police station being interviewed, was not in custody thereafter, because there was no "fundamental transformation in the atmosphere" of the interview) (internal quotations and citations omitted); *State v. Oney*, 187 Vt. 56, 989 A.2d 995, 999–1000 (2009) ("A non-custodial situation does not become custodial automatically because the interviewee has confessed to a crime.... A confession is just one of the circumstances to consider in evaluating whether a reasonable person would feel free to leave.").

In the present case, the trial court's fact-finding was severely truncated by the judge's impressions of the context of the interview and the confession. *Whitfield,* however, dictates that fact-finding, in *Miranda* circumstances, should follow the formula applied by the Court of Special Appeals in the instant case. With respect to what occurred before the interview began, our intermediate appellate court found that Thomas had driven himself to the police station:

> Here, a police officer called [Thomas] and asked if he could "come down to the [police] station," telling him that it had to do with one of his children. [Thomas] agreed and drove himself to the police station. Although the police initiated the contact, the record reflects that the police requested [Thomas]'s presence rather than demanded it, and [Thomas] drove himself to the police station. These facts do not suggest police coercion or restraint. Indeed, by driving himself, [Thomas] had the ability to drive himself home if he had decided to end the interview and leave. The circumstances preceding the interview weigh against a finding of custody.

*Thomas,* 202 Md.App. at 570, 33 A.3d at 509. With respect to nature of the interrogation room, the Court of Special Appeals also noted that Thomas was interviewed in the police station, and that the interview room was adorned with children's toys and a couch:

> [T]hat the questioning of [Thomas] occurred in a police station is a factor to consider, but it is not determinative. Moreover, we note that the interview here occurred in a child interview room, with teddy bears and a couch. This room, which Detective Thorpe characterized as one that did "not look like a police facility," was not, by itself, intimidating.

*Id.* at 571–72, 33 A.3d at 510.

Our brethren further found that there were only two officers present, both of whom were not in uniform, did not have weapons, and were "polite," "courteous," and "respectful:"

We turn next to the manner in which the interview was conducted. The trial court found, and the record reflects, that the officers were "polite," "courteous," and "respectful." This weighs in favor of a finding that [Thomas] was not in custody. *See State v. Smith*, 546 N.W.2d 916, 924 (Iowa 1996) (court looks to "whether a confrontational and aggressive style is utilized in questioning, or whether the circumstances seem more relaxed and investigatory in nature"). Only two officers were present during the questioning, and they both were unarmed and dressed in plain clothes. These facts weigh against a finding that the questioning was conducted in a coercive manner. *See id.* (noting cases finding custody where numerous officers were present and some visibly armed, but no custody where only two officers were present).

*Thomas*, 202 Md.App. at 572, 33 A.3d at 510.

With respect to the level of restraint involved in the interview, the intermediate appellate court found that Thomas was never physically restrained and the officer repeatedly told him he was not under arrest,[7] even after he confessed:

---

7. Chief Judge Bell, in his dissent, argues that the officer's conduct during the interview somehow contradicts their statements that Thomas was not under arrest, because "the petitioner was told that going free was not an option." That dissent, however, mischaracterizes the interaction between the detective and Thomas in an attempt to shoehorn the facts of this case into its theory. After finishing writing his letter to his daughter, Thomas asked, "So how long before it officially happens?" The officer replied, "Let me ask you a question. If you went out of here tonight and you went home, are you going to be okay? Yeah, I don't think so." Thomas responded, "I don't think so." The officer then asked Thomas, "Would you prefer to just get this over with?" Thomas answered, "No, what I prefer is for it not to happen, I know that's not an option," to which the officer replied, "No, it's not."

Contrary to Chief Judge Bell's dissent, this exchange does not contradict the officers' earlier statements that Thomas was not under arrest. The officer *asked* Thomas whether he would prefer to be arrested that night or not. Thomas stated that he would prefer that he never be arrested, to which the officer replied that was not going to happen. All this exchange indicates is that Thomas would be arrested at some point in the future. It does not indicate that he was to be immediately taken into custody. Regardless of the distinction, however, the above-quoted exchange happened, even by the dissent's admission, at the end of the

With respect to whether there was "the presence of actual physical restraint ... or things equivalent to actual restraint," *Owens,* 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield,* 287 Md. at 141, 411 A.2d 415), that factor also weighs against a custody finding. [Thomas] was never physically restrained, and there was no armed guard at the door. Although the two officers sat between [Thomas] and the door, the officers were unarmed and never indicated that they would stop [Thomas] from leaving. In fact, they specifically advised that the door was unlocked.

Moreover, [Thomas] was told, on several occasions, that he was not under arrest. Detective Thorpe so advised [Thomas] at the beginning of the questioning. Toward the end of the questioning, when [Thomas] sought to clarify that he was not under arrest, but he was going to jail, Detective Thorpe stated: "I don't like to lie to people, so what I will tell you is that you're not going to jail tonight. Is there a possibility that you will in the near future? There is a possibility."

*Thomas,* 202 Md.App. at 572–73, 33 A.3d at 510.

With respect to whether Thomas "was being questioned as a suspect or a witness", *Owens,* 399 Md. at 429, 924 A.2d at 1096, the court noted that Thomas was informed by his wife before he got to the police station that he was under investigation for sexual abuse, and thus was aware he was a suspect, but the court did not make a determination as to whether this weighed for, weighed against, or was not relevant to a custody determination:

Another factor to consider in the custody analysis is " 'whether the defendant was being questioned as a suspect or as a witness.' " *Owens,* 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield,* 287 Md. at 141, 411 A.2d 415). This

---

interview, after he had confessed, both orally and in writing. Even if we were to accept the dissent's view that this interaction was an objective circumstance that would indicate to a reasonable person that he or she was not free to leave, and thus render Thomas in custody, it would not mandate the suppression of any evidence, as the exchange occurred after the incriminating statements were given.

factor is relevant, however, only if it is communicated to the suspect because "custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 325, 114 S.Ct. 1526.

\* \* \*

Here, [Thomas] knew, before arriving at the police station, based on his conversation with his wife, that he was being investigated for sexually abusing his daughter. At the beginning of the interview, [Thomas] advised the officers that he knew he was there to talk about his daughter, stating that it was "kind of hard to talk about." Detective Thorpe told [Thomas] that they had spoken with C., and she told them "some things that have been going on for quite some time between you and her." [Thomas] then admitted to touching and abusing his daughter.

*Thomas*, 202 Md.App. at 573–74, 33 A.3d at 511.

Our brethren also noted that Thomas admitted to sexually abusing his daughter, and that the trial court found this factor to be of great importance:

The circuit court considered as a strong factor in favor of finding custody that [Thomas] not only knew he was a suspect, but he actually admitted sexually abusing his daughter. The court stated that "no reasonable person would have thought they could get up and walk out of that room after they confessed to committing a violent crime."

*Thomas*, 202 Md.App. at 575, 33 A.3d at 511.

The court noted that some appellate courts take the position that a confession does not automatically convert an non-custodial interview into a custodial one, stating that a confession was a factor to be considered, but it was not dispositive. *Thomas*, 202 Md.App. at 575–76, 33 A.3d at 512–13. With respect to the instant case, the court determined that, since there was no change in the atmosphere of the interrogation after Thomas confessed, and "none of the objective circum-

stances of the interrogation changed," Thomas's confession did not render him in custody:

> Here, early on in the interview, [Thomas] admitted to engaging in sexual conduct with his 14–year–old daughter. Although this was an admission to a serious crime, none of the objective circumstances of the interrogation changed as a result of [Thomas]'s inculpatory remarks. [Thomas]'s incriminating statements did not render the interrogation custodial.

*Id.* at 577, 33 A.3d at 513.

Finally, with respect to what occurred after the interview concluded, the Court of Special Appeals noted that Detective Thorpe did not intend to place Thomas under arrest at the beginning of the interview, but her intention changed and Thomas was arrested twenty minutes after the questioning was concluded:

> In this case, [Thomas] was arrested twenty minutes after the questioning was concluded. As explained below, however, this did not transform the questioning into custodial interrogation.

> The Supreme Court of Connecticut has stated that, although the failure to arrest a suspect supports a finding of no custody, the reverse may not be true; that the defendant was arrested after the interrogation does not necessarily mean that he or she was in custody during the interrogation. *State v. Pinder,* 250 Conn. 385, 736 A.2d 857, 876 (1999).

> \* \* \*

> Detective Thorpe testified, without contradiction, that when she began the interview, she did not intend to place [Thomas] under arrest. Her intentions changed "toward the end of the interview," when [Thomas] told her that he "wasn't coping well," and she "became concerned about his safety." Although Detective Thorpe's subjective intent is not a factor, it is consistent with the manner of the questioning here. [Thomas]'s arrest under the facts of this case

should be given neutral status; it does not weigh in favor of or against a finding of custody.

*Thomas,* 202 Md.App. at 577–78, 33 A.3d at 513.

■ Turning, now, to the questions as hand, we note that, initially, Thomas asks that we adopt a presumption that an individual is in custody when "police have sufficient evidence to make an arrest prior to questioning; the person knows this before being questioned; and the questioning then takes place away from public view inside a police station." Essentially, he is stating that he was in custody because he believed that police had enough evidence to arrest him.

The State responds by noting that the presumption of custody Thomas is requesting would be akin to a categorical rule that every suspect who believes police have enough evident to arrest him or her is in custody. The State argues that the Supreme Court explicitly rejected a categorical rule in *Howes v. Fields,* —— U.S. ——, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012), in which the Court reiterated that a trial court should have considered all the facts surrounding an interrogation of a prison inmate to determine if the interrogation was custodial or not.

■ With respect to the first issue presented by the presumption Thomas requests, it is clear that his assumptions regarding the state of the evidence against him is irrelevant in a *Miranda* analysis. *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). In *Stansbury,* the Supreme Court considered whether it was appropriate for the California Supreme Court to have considered the interrogating officer's subjective beliefs regarding Stansbury's culpability. The Supreme Court held that it was not, stating that, "[o]ur decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by *either the interrogating officers or the person being questioned." Id.* at 323, 114 S.Ct. at 1529, 128 L.Ed.2d at 298 (emphasis added). *See also United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir.1996) ("The test is objective: the

actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.").

■■ The instant case is, however, even more attenuated than whether Thomas's assumed there was enough evidence against him—he presumed that the officers believed they had probable cause to arrest him. Even assuming that Thomas's assumption was relevant, his belief was predicated upon uncommunicated thoughts, which cannot form the basis for requiring *Miranda* warnings, as the Supreme Court recognized in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In *Berkemer*, the Court was concerned with whether the roadside detention and questioning of a driver violated *Miranda*. The Court held that it was irrelevant that the officer "apparently decided as soon as [McCarty] stepped out of his car that he would be taken into custody and charged with a traffic offense," because the officer never communicated the decision to the defendant. *Id.* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. The Court explicitly rejected McCarty's argument that once the officer had probable cause to arrest him, he was in custody, stating that,

> [t]he threat to a citizen's Fifth Amendment rights that Miranda was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. And, by requiring a policeman conversing with a motorist to constantly monitor the information available to him to determine when it becomes sufficient to establish probable cause, would be extremely difficult to administer.

*Id.* at 435 n. 22, 104 S.Ct. at 3148 n. 22, 82 L.Ed.2d at 331 n. 22. The same holds true in the present case. Whether police officers have sufficient evidence to arrest, or believe they do, is irrelevant to a *Miranda* determination. *United States v. Woods*, 720 F.2d 1022, 1031 (9th Cir.1983) ("[W]hether or not the police have probable cause for arresting the suspect, has no relevance as to when the person's right to receive warnings attaches." (internal citation and quotation marks omitted)).

Thomas, nevertheless, asserts, in his second question, that an analysis of all the factors surrounding his interrogation supports that he was subjected to custodial interrogation as soon as he entered the police station:

> key factors that point to petitioner being in custody include: 1) prior to questioning, petitioner was aware that the police had been told by his wife and daughter that he had been sexually assaulting his daughter, thus he knew they had sufficient evidence to arrest him before he even said one word; 2) petitioner was questioned inside a police station interview room with two detectives seated between himself and a closed door; 3) the detectives never once told petitioner he was free to leave or did not have to cooperate; 4) police confronted petitioner with the evidence they had against him, his daughter's own words to them; and 5) he was actually placed under arrest shortly after the interrogation ended.

The State counters that the Court of Special Appeals correctly determined that Thomas was not in custody for the duration of his interview, highlighting that Thomas voluntarily came to the police station, was told he was not under arrest, was told the door was unlocked, was confronted with officers who were not in uniform or armed, and was left alone for a period of time.

 A custody determination for *Miranda* purposes is factually intensive, given that the facts and circumstances surrounding each interrogation a court is asked to analyze will vary from case to case. *Whitfield*, 287 Md. at 139, 411 A.2d at 424. Rarely will one fact pattern be replicated from case to case, but analyses of similar factual patterns may provide the fodder for informed discussion.

One case with a factual pattern similar to the instant case is that of *United States v. Chee*, 514 F.3d 1106 (10th Cir.2008), in which the Court of Appeals for the Tenth Circuit considered whether Chee was in custody when he voluntarily came to the police station to discuss a firearm that he had found in a car he bought at a government auction; the police, however,

quickly began asking him about an alleged sexual assault they believed he committed. *Id.* at 1110–11. Chee was lead by two investigators into an office, the door to which had been closed but not locked, to be questioned and was repeatedly told he was not under arrest and could go. The officers were not dressed in uniform, did not have guns or handcuffs visible, and never physically restrained Chee. The tone of the questioning was calm and polite and did not change after he confessed to raping a woman. *Id.* at 1114. The interview lasted approximately an hour, during which Chee also wrote a letter of apology to the victim, at the investigators' suggestion, and provided a DNA sample. *Id.* at 1111. Chee was allowed to leave the police station after the interview concluded, but was, thereafter, arrested[8] and charged with aggravated sexual abuse while in Indian country, Sections 1153(a) and 2241(a)(1) of Title 18 of the United States Code, and subsequently was convicted, after having unsuccessfully moved to suppress his statements. *Id.*

The Tenth Circuit affirmed, reasoning that Chee was not in custody when he confessed because the tone of the interview was non-confrontational, the interview was relatively short, and he had voluntarily come to the station. That court also discounted Chee's argument that once he confessed, he was in custody, stating, " '[n]o Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation.' " *Id.* at 1114, quoting *Locke v. Cattell,* 476 F.3d 46, 53 (1st Cir.2007).

Likewise, in *State v. Isaac,* Greene App. no. 2003–CA–91, 2004 Ohio 4683, 2004 WL 1949429, the Ohio intermediate appellate court also applied the totality of the circumstances test to facts similar to those now before us and determined that Isaac was not in custody when he confessed. In the case, Isaac had driven himself to the interview at the police station,

---

8. Neither the Circuit Court, *United States v. Chee,* 514 F.3d 1106 (10th Cir.2008), nor the District Court, *United States v. Chee,* 2:05 CR 773, 2006 WL 2355837 (D.Utah August 15, 2006) identified precisely how much time elapsed between Chee's interview and his arrest.

which lasted about two hours and was conducted by two detectives. Isaac was seated in an interrogation room, but was not restrained in any way, and the door, although it was closed, was not locked. The detectives told Isaac he was not under arrest and was free to go, the tone of the interview was relaxed and non-confrontational, and Isaac was left alone for periods of time. *Isaac,* 2004 Ohio 4683, at P23–P24, 2004 WL 1949429. While speaking with the detectives, Isaac confessed to having sexual contact with a ten-year-old child, and he was arrested following interrogation. After unsuccessfully moving to suppress the statements he made at the police station as violative of his *Miranda* rights, he plead no contest to three counts of forcibly raping a child under ten years of age and was sentenced to three concurrent life sentences. *Id.* at P3–P5.

On appeal, the Ohio intermediate appellate court, *inter alia,* affirmed the denial of his motion to suppress. The court held that the aforementioned facts dictated a finding that Isaac was not in custody, stating that, "a reasonable person in Defendant's position during this police interview would have understood he was free to walk away from the questioning by police and leave, despite being at the police station." *Isaac,* 2004 Ohio 4683 at P25, 2004 WL 1949429. Moreover, that court rejected Isaac's assertion that once he confessed, he was in custody, stating, "[t]he mere fact that Defendant confessed to the crime during the interview, leading to his arrest at the conclusion of the interview, does not convert a non-custodial interview into one which is custodial." *Isaac,* 2004 Ohio 4683 at P26, 2004 WL 1949429.

The courts in both *Chee* and *Isaac* analyzed the introduction of the defendants' statements from the outset of the interviews and then again when they confessed. In the present case, Thomas, however, only argues that he was in custody when he arrived at the police station, the salient facts of which are: that Thomas drove himself to the interrogation; that the interrogation took place at the police station; that the questioning was conducted in a small room filled with children's toys, a couch, and two chairs by two officers who were

unarmed and not in uniform; that Thomas was seated, unrestrained, on the couch and was informed that the door to the room was unlocked, even though it was kept closed; and that the police told him numerous times that he was not under arrest, including at the outset of the interview.

Given these facts, even when viewed in the light most favorable to Thomas, a reasonable person in Thomas's situation would have felt free to end the encounter and leave. To be sure, the police never told Thomas "you are free to go." They did, however, tell him he was not under arrest, repeatedly, and that the door to the room was unlocked. Thomas also came to the police station of his own volition, even after being told the true nature of the conversation that was to occur. He was not physically restrained, nor did the detectives interfere with Thomas's movements, although they were seated between him and the door. When all these factors are considered, we conclude, along with our brethren on the Court of Special Appeals, that, although the police never uttered the talismanic words "you are free to go," that Circuit Court judge erred in granting the Motion to Suppress.

Were Thomas to be asserting that his confession to inappropriate touching rendered him in custody, which he apparently does not, his arguments would still be disposed of under the rationale of *Chee* and *Isaac*. In addition to the fact that a confession does not, *per se*, render an individual in custody, once Thomas confessed the atmosphere in the room never changed, as was noted by the Court of Special Appeals. *See Commonwealth v. Hilton*, 443 Mass. 597, 823 N.E.2d 383, 397 (2005) (stating that the important inquiry concerning confessions and *Miranda* is whether there was a "fundamental transformation in the atmosphere" of the interview). Thomas's admission to sexual offense involving his daughter did not render him in custody, just as Chee's admission to rape and Isaac's admission to forcible child rape did not render them in custody.

Thomas, however, cites *Buck v. State*, 181 Md.App. 585, 956 A.2d 884 (2008), to support his argument that he was in

custody. In *Buck,* police officers wanted to question Buck regarding a murder that had occurred. *Id.* at 597, 956 A.2d at 891. They met him on the street and spoke with him about the murder, and one officer called his supervisor and informed him that "I think we got him." *Id.* The police came to Buck's house several days after this encounter on the street and asked him to come with them to the police station, but told him that he was not under arrest and was free to go. *Id.* at 598, 956 A.2d at 891–92. Buck agreed to accompany them to the station house and, upon arriving, was lead to a secure part of the building for questioning. *Id.* at 599, 956 A.2d at 892. Buck was not permitted to walk around unescorted and was placed in an interrogation room containing only two chairs and a table. His interview lasted for five hours; when he asked to take a cigarette break, Buck was accompanied by an officer. *Id.* After his break, Buck agreed to give a DNA sample and, shortly thereafter, confessed to the murder. *Id.* at 600–01, 956 A.2d at 893.

The Court of Special Appeals held that Buck's statements at the police station should have been suppressed because Buck was in custody and *Miranda* warnings were not given to him. The court based this determination on the length of the interview, that the police confronted Buck with their suspicions that he was the murderer, that the police told him he was a suspect in the murder, and that he had been taken to the police station by the police. *Id.* at 624–25, 956 A.2d at 907–08.

*Buck* is distinguishable from the instant case for many reasons, but certainly on the bases that five hours elapsed before Buck's confession and Buck's conduct was controlled by the officers even before he arrived at the police station. Here, Thomas says as soon as he walked in to the police station he was in custody, requiring *Miranda* warnings. He was not.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

BELL, C.J., and GREENE, J., dissent.

ADKINS, J., concurs and dissents.

BELL, C.J., dissenting, in which GREENE, J., joins.

Correctly asserting that a showing that police officers merely in possession of sufficient evidence to arrest does not establish custody or even a presumption of custody for *Miranda*[1] purposes, the majority supposes, and therefore holds, that a reasonable person in the petitioner's position would understand that, during a police interrogation, he could terminate that interrogation and freely leave at any time before the police officers announce that he is under arrest. The majority does so by relying heavily on the facts that the petitioner: came to the police station for the interrogation unaccompanied by, albeit at the request of, the police; was not handcuffed during the interrogation; was told by the officers on more than one occasion that he was not under arrest; and was treated civilly, politely.

The majority arrives at this conclusion in spite of other, more damning facts: that when the petitioner arrived at the police station, he was fully aware of the purpose for which the police wished to speak to him, to inquire into the sexual, therefore incestuous, relationship between his daughter and himself; that during the interrogation, which lasted at least one hour, the petitioner was locked in the interview area; that the officers were, at their election and direction, between the petitioner and the door; that, at no time, either before or during the interrogation, was the petitioner told he was, or would be, free to leave;[2] that, during the interrogation, the petitioner was subjected to a barrage of accusatory questions

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. As we shall see, the police told the petitioner on at least 2 occasions that the door to the interview room was not locked. The inference to be drawn from those assertions is that the petitioner was free to go. Such an inference does not replace, and certainly does not undermine, the importance, to the determination, objectively, of a defendant's state of mind, of a direct and express statement.

and confronted with evidence of his own guilt, resulting in his confession to having committed incestuous criminal acts with, and to having pornographically photographed and videotaped, his daughter; and that, prior to signing a written confession, he was told that he would be arrested at the conclusion of the interrogation. Therefore, the majority is wrong to assert that the petitioner should, and a reasonable person in his position would, have understood that he could end the interrogation at will. In fact, it is because the petitioner was subjected to a custodial interrogation without being apprised of his *Miranda* rights that I respectfully dissent.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), concerned about "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation," the Supreme Court recognized "the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." *Id.* at 439, 86 S.Ct. at 1609, 16 L.Ed.2d at 704. The Court framed the issue as follows:

> "The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all the cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admitted at their trials. They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."

*Id.* at 445, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. Although the Court acknowledged that police interrogations serve an important social function, it also recognized that police-dominated

environments, where individuals were isolated from third parties, fostered coerced testimony. *Id.* at 458, 86 S.Ct. at 1619, 16 L.Ed.2d at 694. Thus, the Court observed:

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles— that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."

*Id.* at 457–58, 86 S.Ct. at 1619, 16 L.Ed.2d at 722. To minimize the risk of tainted confessions,[3] the *Miranda* Court

---

**3.** The Court further explained its rationale and solution, thusly:

"Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

"It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws. However, unless we are shown other procedures which are at least as effective

mandated that, prior to any custodial interrogation, an individual be provided with notice and the opportunity to exercise his or her Fifth Amendment right against compelled self-incrimination. The Court held:

> "[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right."

*Id.* at 471–72, 86 S.Ct. at 1626, 16 L.Ed.2d at 722. The *Miranda* Court reasoned that without this prophylaxis, police interrogation practices would reduce the Fifth Amendment right against compelled self-incrimination to a mere "form of words." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920)).

---

in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed.

"At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury. Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it."

*Miranda,* 384 U.S. at 467–68, 86 S.Ct. at 1624–25, 16 L.Ed.2d at 720.

In the years following *Miranda*, the Supreme Court has consistently recognized that the *Miranda* rule is triggered wherever the elements of police custody and interrogation coexist. *See, e.g., J.D.B. v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011) (observing that *Miranda* warnings are triggered in the context of a custodial interrogation); *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383, 395 (1995) (same); *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (same). That also has been the case in Maryland. *See e.g., State v. Rucker,* 374 Md. 199, 210, 821 A.2d 439, 446 (2003) (observing that an individual must be provided *Miranda* warning prior to any custodial interrogation); *Crosby v. State,* 366 Md. 518, 528, 784 A.2d 1102, 1108 (2001) (same).

In this case, there is no dispute as to one of the *Miranda* requirements, interrogation. Everyone, the parties, the majority and the dissent, agree that the petitioner was interrogated. They do not agree, and thus the remaining question, as to whether the petitioner was in custody when he was interrogated.

Whether a defendant was in custody when he or she was interrogated is a determination that is made on an objective basis, *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298–99 (1994), and involves assessing the interviewee's state of mind from the perspective of a reasonable person in his or her position.[4] *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984). In making that determination, this Court inquires whether, under the totality of the circumstances, a reasonable person in the position of the interviewee would believe that he or she was, or would have believed that

---

4. As Judge Posner, writing for an unanimous panel of the United States Court of Appeals for the 7th Circuit, has pointed out, "[c]ustody for *Miranda* purposes is a state of mind. When police create a situation in which a suspect reasonably does not believe that he is free to escape their clutches, he is in custody and, regardless of their intentions ..., entitled to the *Miranda* warnings." *United States v. Slaight,* 620 F.3d 816, 820 (7th Cir.2010).

he or she would have been, free to leave. *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383, 395 (1995).

Factors that inform the determination of whether, under a specific factual scenario, there is police custody have been identified, *see Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 335–36 (holding that the duration and location of the interrogation are relevant factors); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (holding whether the suspect came to the interrogation voluntarily is relevant factor); *Stansbury v. California,* 511 U.S. 318, 322, 325, 114 S.Ct. 1526, 1528, 1530, 128 L.Ed.2d 293, 298, 300 (holding that whether the interviewee was questioned as a suspect can be a relevant factor); *JDB v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 2396, 180 L.Ed.2d 310, 316 (holding that the interviewee's apparent age can be a relevant factor), and, as is the case in Maryland, *see Owens v. State,* 399 Md. 388, 428, 924 A.2d, 1072, 1095 (2007); *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415 (1980), are well-settled. In *Whitfield,* this Court made clear what those factors are and include:

> "when and where it occurred, how long it lasted, how many police officers were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers.[5] Finally, what happened after

---

**5.** Interestingly, the suppression court had a different take on this matter:

> "Now it's relevant in this case that the defendant, Mr. Thomas, is a sergeant in the United States Army. I think it's a reasonable inference that if the police want to talk to you about your children, and particularly when he finds out that it's about his daughter, that a

the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Id.* at 141, 411 A.2d at 425 (quoting *Hunter v. State,* 590 P.2d 888, 895 (1979)). As this list makes clear, events occurring before and after the interrogation may be relevant factors. There is, to be sure, no exhaustive list of what factors or circumstances are dispositive of the issue of custody, *see Whitfield v. State,* 287 Md. 124, 139–40, 411 A.2d 415, 424–25 (1980); however, the *Miranda* Court's emphasis on avoiding the effects of isolated police-dominated environs, a continuing and consistent theme in the *Miranda* jurisprudence, must always be considered. *See e.g. Dickerson v. United States,* 530 U.S. 428, 429, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405 (2000) (declining to overrule *Miranda* and recognizing that the concerns underlying *Miranda* are still present in modern interrogations).

The majority correctly states the test for determining whether a defendant was in custody and, therefore, was required to receive the *Miranda* warnings, op. at 259-60, 55 A.3d at 688-89; however, it misapplies the test, just as it accuses the trial court of having done. Reasoning "[i]f confession is the trigger for custody ... then each person who confesses in a police station must have been given *Miranda* warnings per se, which is without basis in *Miranda* jurisprudence," the majority faults the suppression judge for having been influenced by his impressions of the context of the interview and the confession and of basing his conclusion that the petitioner was initially in custody on the fact that the petitioner was at the police station and that he later confessed. *Id.* at 259-61, 55 A.3d at 688-89. For its part, in order to arrive at the result it reaches, the majority inflates the value

---

sergeant who is a supervisor in the United States Armed Forces does not want police detectives coming on the base to talk to him about sexually abusing his daughter. I think it's a reasonable inference. "So, certainly, he was going to go down to the police station to talk to them, as opposed to having them come to him."

of some of the factors, while omitting or under-valuing others. Thus, the majority gives great weight to the following facts:

> "that Thomas drove himself to the interrogation; that the interrogation took place at the police station; that the questioning was conducted in a small room filled with children's toys, a couch, and two chairs by two officers who were unarmed and not in uniform; that Thomas was seated, unrestrained, on the couch and was informed that the door to the room was unlocked, even though it was kept closed; [6] and that the police told him numerous times that he was not under arrest, including at the outset of the interview."

*Id.* at 271-72, 55 A.3d at 695-96. If the majority's analysis is correct, if it has properly applied the custody determination test, then the prophylactic purpose and effect of *Miranda* is effectively eviscerated; indeed, as the custody analysis is applied by the majority, a gaping loophole has been provided that renders *Miranda* virtually useless.

---

**6.** The suppression court found, and the record supports, that the door to the interview room in which the petitioner was interrogated, though closed, was unlocked and that, on more than one occasion, the petitioner was so advised. Op. at 270-71, 55 A.3d at 695. Nevertheless, there is reason to suspect, and evidence supporting such a conclusion, that the petitioner was locked in the interview area for the entire duration of his interrogation and, thus, could not escape the police officers' control. The interview room in which the petitioner was interrogated was a part of a larger interview area, access to which was controlled by another door. The door that provided access to the area where the "small" interview rooms were located, Detective Thorpe, who conducted the majority of the interrogation, testified, was locked and could only be opened by a keycard, which was possessed by the detectives. Viewing this fact in the light most favorable to the petitioner, as we must, it is clear that rather than supporting the State's contention that the petitioner was not in custody, it tended to show that the petitioner's freedom was significantly curtailed because at no point during the interrogation could the petitioner have left of his own accord. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (holding that the Fifth Amendment privilege against compelled self-incrimination is available to all persons in any setting in which their freedom of action is significantly curtailed in any significant way).

I do not agree with the majority that the suppression court's reason for suppressing the statement was limited to the fact that the petitioner confessed. Indeed, the majority's analysis of the trial court's analysis suffers from the same flaw it attributes to the trial court: its impression of the context of the court's opinion. Also, it seems to require a certain formulaic fact-finding, which it says, inaccurately, in my view, *Whitfield* dictates. Op. at 261-62, 55 A.3d at 689-90. The majority's interpretation of the trial judge's ruling is belied by the trial judge's opinion, which the majority has reproduced at op. at 251-58, 55 A.3d at 684-88. To be sure, the Circuit Court did focus on, and emphasize, the folly and lack of reality of a defendant being able to leave a police interrogation after he or she has confessed to a serious, violent crime; however, its comments also addressed the nature of the interrogation at its outset. For example, the judge commented that "a system of subterfuge has developed in the law enforcement community with respect to interrogation techniques," op. at 255, 55 A.3d at 686, after which he observed: "[t]he defendant was not at the station for a social visit. The detectives wanted to make this prosecution. They told the defendant he was not under arrest and the door was unlocked." *Id.* Recognizing the difference between station house interrogations and sidewalk encounters with suspects, the court further observed:

"Now interrogations in police stations are inherently custodial whether they are coercively so or whether it's to the extent that it's violative of the requirements of Miranda is what these cases are all about. And that's why the Court must consider each factual situation on its own legs,"

op. at 255, 55 A.3d at 686 concluding:

"I don't know of any cases, as I said earlier, where a person just gets up and just walks out of a police station or feels that he can. What reasonable person would think that?"

Op. at 256, 55 A.3d at 686. Thereafter, the court addressed the factors our cases have identified as necessary to the custody determination. Tellingly, he found significant that the peti-

tioner was not told that he was free to go and concluded that the petitioner was questioned as a suspect, not as a witness:

"The Court also considers that the questions that were being asked were specific not so much as to find out what happened. These questions weren't to find out what happened—simply to find out what happened. These questions were being asked to gather evidence. That's what the detectives were doing, they were gathering evidence.

"What did you do? Where was she touched? When did it start? How many times did you do it? And the argument is that Miranda warnings should not have been given?"

Op. at 256, 55 A.3d at 686-87.

I do not agree with the majority's custody analysis. In fact, I am not at all sure that the majority even, and at any rate properly, applied the objective test. That test, as we have seen, looks, for guidance, to a reasonable person in the position of the defendant and it asks what that person would do, given the same knowledge and circumstances as the defendant. The nature and perception of the crime of which the defendant is suspected is a relevant and an important consideration. Sexual child abuse, especially that involving incest, is a most serious crime, *see Walker v. State,* 206 Md.App. 13, 41–42, 47 A.3d 590, 606–607 (2012), and is treated as such. *See id.* Indeed, our laws are designed, by penalty and procedure, to protect our children from such heinous and reprehensible behavior. Md.Code (2002, 2012, repl.vol.) § 3–602 of the Criminal Law Article makes it a felony to sexually molest or exploit a minor and prescribes the penalty for its violation: imprisonment of up to 25 years. Md.Code.Crim. Law. § 3–602(c). Sexual abuse of a child falls under "seriousness fine" category II in the Code of Maryland Regulations ("COMAR") sentencing policy. COMAR MD ADC 14.22.02.02. This is the same as attempted 1st degree murder and actual 2nd degree murder. *See id.*

To the extent that the suppression court focused on the confession,[7] I believe it was an appropriate application of the test. The court simply recognized what is common sense, that a reasonable person, aware that he or she is suspected of committing an heinous crime will not expect to be able to just walk away. That is especially the case when the interrogation has confirmed that he, in fact, committed the act or acts of which he was suspected. As the suppression judge put it:

"It's a scary thought to think that in this community a citizen could walk into a police station, confess to a violent crime, and then they are free to leave. The State argues that a man who goes in and says that I was, I sexually abused my daughter can just leave. And that flies in the face of reason that you could go in and confess to a murder and just walk out of the station, you're not under arrest and you're not, and you're not in custody."

The majority finds relevant to the application of the objective test that the detectives did not communicate certain of their intentions, or the level of their knowledge, to the petitioner. Because it is an objective test, I fail to see how what was not communicated could inform the petitioner's state of mind. If it does, it would seem to be taking on the contours of a subjective test—but from the perspective of the State. That would be a total departure from our jurisprudence on the subject.

Moreover, the majority gives short shrift to the failure of the officers to advise the petitioner that he was free to go at any time, a finding the trial court made and reiterated, op. at

---

7. When the defendant confesses, following an interrogation, to committing the exact crime of which he or she was suspected and which prompted the interrogation, I believe it is logical to assume, and illogical to conclude otherwise, that the interrogation was custodial. I am aware of *United States v. Chee*, 514 F.3d 1106 (10th Cir.2008) and *State v. Isaac*, 2004 Ohio 4683, 2004 WL 1949429 (Ohio App.2004), which reached a different result. Although each is distinguishable—in both cases the interviewee was informed that he was free to leave—I am not persuaded by the courts' reasoning. These cases pay only lip service to the totality of the circumstances test, applying it in a strained manner, and failing to apply it using common sense.

255-56, 55 A.3d at 686-87, by referencing and crediting their statements to him that he was not under arrest and informing him that the door to the interview room was closed but not locked. *Id.* That the police were positioned between him and the door is explained by the fact that the officers did not use any restraint to restrict the petitioner's movement. Op. at 262-63, 268, 55 A.3d at 690, 693-94. Also of significance to the majority is its belief that the petitioner focuses his custody argument on when he arrived at the police station.

The test to be applied to the review of a ruling on a motion to suppress a defendant's statement was clearly stated in *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990):

"When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee,* 298 Md. 565, 571, 471 A.2d 712, *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md.Rule 8–131(c)."

When the motion has been granted, we consider the facts, limited to those adduced at the suppression hearing, in the light most favorable to the defendant. *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000) (holding that prevailing party on the motion to suppress at trial is entitled to all reasonable inferences from the facts). That the detectives were seated between the petitioner and the interview room door is not disputed. Nor is it disputed how this came about. Immediately upon entering the interview room, Detective Thorpe directed the petitioner to sit on a couch against the wall farthest away from the interview room door, although there were other seats in the room. The detectives then

placed themselves between the interview room door and the petitioner. Rather than being the result of a voluntary choice, the petitioner's place in the interview room was dictated by the detectives. This, I submit, is highly relevant and telling with regard to how these undisputed facts ought to be interpreted in conducting our constitutional appraisal. Being directed where to sit, rather than being allowed to find his own place, would suggest to, and further buttress the very common sense belief of, any reasonable person in the position of the petitioner that he was not free to leave. *See Bond v. State,* 142 Md.App. 219, 234, 788 A.2d 705, 713 (2002) (holding the interviewee was subject to a custodial interrogation where three officers blocked the interviewee access to the nearest door).

In addition to conducting the interrogation in an interview area accessible only through a locked door and directing the petitioner's seating in the interview room so that his access to the door was "blocked" by the detectives, who positioned themselves between him and the door, the detectives never told the petitioner that he was, or would be, free to leave, or that he could terminate the interrogation at any time. *See United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990) (opining that the most obvious and effective way to demonstrate that a suspect is not in custody is to tell the suspect he is not under arrest, free to leave, and capable of terminating the interview at will). As we have seen, the majority counters that the detectives told the petitioner, at least twice during the interview, that he was not under arrest. Op. at 262-63, 270-71, 55 A.3d at 690, 695. While this is a relevant factor, it is not a substitute for informing a defendant that he or she is not required to participate in the interrogation and can withdraw at any time. Telling a defendant that he is not under arrest does not convey the message that he may stop "playing" whenever he wishes.

In any event, this factor does not support the majority's analysis. It is contradicted, and negated, by what transpired later. *See United States v. Craighead,* 539 F.3d 1073, 1088 (9th Cir.2008) (explaining that informing a suspect he is not under

arrest does not make an interrogation non-custodial; the reviewing court must consider the "statements within the context of the scene as a whole"). Not only did the detectives, by their actions, undermine these statements during the interrogation, but they contradicted them in fact. Nearly one hour into the interview, the detectives suggested to the petitioner that he provide a written confession in the form of an "apology letter" to his daughter so that she would know the sexual acts committed against her were not her fault. The detectives left the room for approximately twenty minutes to allow the petitioner to do so. When, prior to signing the "apology letter," the petitioner told the detectives that he would rather not be arrested, the petitioner was told that going free was not an option. The detectives immediately thereafter, in effect, instructed the petitioner to sign his confession. The detectives' statements, in short, both contradicted earlier assertions that he was not under arrest and demonstrated that the petitioner was under the control of police at the time he signed his own confession.

Moreover, the defendant was arrested in fact at the conclusion of the interrogation. *See Whitfield v. State*, 287 Md. 124, 141, 411 A.2d 415 (1980) (observing that arrest at the conclusion of an interrogation is indicative of police custody during an interrogation). The majority omits this factor from its list of "salient facts," op. at 270-71, 55 A.3d at 695, despite the abundant authority, including our cases, holding that the arrest of an interviewee at the conclusion of his interrogation is an indicia of custody. *See id; see also Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*per curiam* ) (determining that the defendant was not in custody on the basis that he allowed to leave following the interrogation); *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam* ) (same).

The majority notes that Detective Thorpe only decided to arrest the defendant because she became concerned with his safety near the end of the interrogation. Op. at 264-65, 55 A.3d at 691-92. This is simply a statement of the officer's intent and, therefore, if relevant to the custody analysis at all,

cannot be dispositive. *See State v. Rucker*, 374 Md. 199, 210, 821 A.2d 439, 445 (2003) (observing that the only relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); *Whitfield v. State*, 287 Md. 124, 143, 411 A.2d 415, 426 (1980) (holding that the subjective intent of police officer is irrelevant to the *Miranda* custody determination); *see also Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that an officer's unarticulated thoughts have no bearing on the custody analysis). The fact is, the petitioner was arrested following his interrogation. Consistent with our cases and *Miranda* jurisprudence, this indicates that the petitioner was in custody during his interrogation, the detectives' change of heart to the contrary notwithstanding. *See id.*

Equally problematic to the majority's custody analysis is its failure to acknowledge, and give weight to, the fact that the petitioner was interrogated as a suspect (as opposed to a witness) who committed several heinous crimes. *See Whitfield v. State*, 287 Md. 124, 141, 411 A.2d 415 (1980) (observing that whether the interviewee is questioned as a witness or suspect is a relevant factor to the custody analysis). The majority asserts that the knowledge that the petitioner had that led him to believe that he was a suspect is irrelevant unless it constitutes an objective fact within the totality of the circumstances. Op. at 266-67, 55 A.3d at 692-93. Stated differently, the majority states that any belief that the petitioner had that he was a suspect is irrelevant since it must have derived from his subjective knowledge. *Id.*

Aside from the fact that the petitioner's knowledge was confirmed both by the police request that he come to the station and by the preliminary discussions leading to the interrogation and, therefore, was objective, the majority does not negate, nor can it, the fact that the interrogation itself demonstrated that the petitioner was interviewed as a suspect. This is what our past cases teach, *see e.g., Whitfield v. State*, 287 Md. 124, 141, 411 A.2d 415 (1980), and what the Supreme Court held in *Stansbury v. California* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994), that "[a]n officer's

knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." In this case, the detectives' questions and assertions, from the beginning of the interrogation, provided ample indication to the petitioner, and would have to a reasonable person, that he was suspected of committing several serious crimes involving his daughter. To be sure, the detectives did not explicitly mention sexual acts until after the petitioner made the first of several incriminating statements. The interviewing detectives instead referred to the sexual acts between the petitioner and his daughter as "some things" going on between the petitioner and his daughter (Ex. "She told us about some things going on between you and her"), or as simply "incidents" (Ex. "When did the incidents start?"). Whether the detectives confronted the petitioner at the outset with veiled references, such as "incidents" or "some things", instead of explicit references to touching genitalia or anal sex makes no difference as to whether the petitioner was questioned as a suspect. The petitioner is entitled to the benefit of all inferences reasonably to be drawn from the facts. *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000) (holding that prevailing party on the motion to suppress at trial is entitled to all reasonable inferences from the facts). A reasonable person in the position of the petitioner could, and I submit would, infer from the content of the conversation that he was being interviewed as a suspect to several atrocious crimes and therefore was subject to the police's control.

The majority's approach overlooks, if not deliberately disregards, the fact that the petitioner was confronted with allegations that he had sexually assaulted his daughter through a series of accusatory statements and questions. *See Stansbury v. California* 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994) (explaining that an officer's communicated suspicions are relevant to the extent "they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'") (quoting *Berkemer v. McCarty* 468 U.S. 420, 435, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984)). Early in the

interrogation, Detective Thorpe told the petitioner that he was called in to speak with the Family Crimes detectives because of "some things" going on with his daughter. Detective Thorpe then informed the petitioner that his daughter told the detectives about "some things" going on between her father, the petitioner, and her. Detective Thorpe further implicated the petitioner in these incidents when he then asked, "When did it start?"

After the petitioner admitted that the incidents began shortly before the family moved to Maryland, the detectives' questions became more direct and explicit. The detectives asked for personal details that implicated the petitioner in criminal sexual acts: "Did you start penetrating her vagina to get her prepared for you?" The detectives asked leading questions premised on, and containing, inculpatory facts: "And then you put your penis inside her vagina, correct?" The detectives revealed information to the petitioner obtained from the victim: "There were times [the touching] was under the clothing as well." If the detectives did not receive direct answers, their questions became more threatening and accusatory: "You want me to tell you what she told me?" Several other questions included whether the victim had pubic hair at the time of the incidents, whether the petitioner had used his fingers, penis, or tongue in conducting anal/vaginal penetration, whether there was mutual touching of genitalia, whether pornography was used, whether the petitioner had stored pornographic photos and videos of his daughter on his computer, whether acts of oral sex were performed between the petitioner and his daughter. The detectives also requested addresses where pornographic photos and videos of the petitioner's daughter might be stored, and a confession in the form of an apology letter addressed to the petitioner's daughter.

This was not an investigatory chat with a witness. As the suppression court concluded, the detectives' inquiries were designed to elicit admissions of guilt. Setting aside whether the information he received from his wife that the police suspected him of child abuse rose to the level of objective fact,

the statements and inquiries by the police themselves were direct, personal, and accusatory enough to indicate to a reasonable person that he was a suspect in several heinous crimes. The majority's analysis does not extend to the nature, form or contents of the detectives' inquiry. This is curious given that we are to assess whether a reasonable person in the position of the petitioner would understand that he could terminate the interrogation and walk away. *See Yarborough v. Alvarado,* 541 U.S. 652, 662, 124 S.Ct. 2140, 2155, 158 L.Ed.2d 938 (2004) (citing *Berkemer v. McCarty* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984)). It strains the imagination to accept, as the majority does, that a reasonable person with knowledge, confirmed by the police via their interrogation, that he not only was suspected of committing child sexual abuse, but that the police had witness evidence of his culpability, would entertain any belief that he remained a free agent. It is even more unreasonable and unrealistic to believe that any such person would believe that he could admit to committing these horrific acts and think that he could freely walk away from a police station.

I dissent.

Judge Greene has authorized me to state that he joins in this dissenting opinion.

ADKINS, J., concurring and dissenting.

Petitioner Konnyack Thomas was invited to a police station by a phone call from a police officer, regarding one of his children. The officer did not name which child. Once at the station, Petitioner was led through a locked door, which could only be opened with a passkey.[1] He was then taken through a second door and into a small room, where the door was closed behind him. The officers in that room physically placed themselves between Petitioner and the exit door and told Petitioner twice at the very beginning of an hour-long session

---

1. The record does not show whether this door was locked from the inside as well.

that the door to that interview room was unlocked. These officers never told Petitioner that he could leave.

I agree with the Majority that these circumstances—by themselves—do not mandate custody. Yet, I would find that this lack of custody does not remain constant throughout the encounter. Within minutes of his arrival, Petitioner was being asked serious questions about sexual encounters with his daughter:

Detective Thorpe: Okay. What exactly started in Georgia?

Mr. Thomas: Just touching.

Detective Thorpe: Touching? Mutual or just you touching her?

Mr. Thomas: Just touching.

Detective Thorpe: Touching? What is touching to you? Because touching can be her masturbating you, touching can be you fingering her.

Mr. Thomas: Just touching.

Detective Thorpe: Was it both?

Mr. Thomas: No.

Detective Thorpe: Okay.

Sergeant Birch [2]: Were you touching her?

Mr. Thomas: Yes.

Sergeant Birch: All right, where were you touching her?

Mr. Thomas: Private areas.

Sergeant Birch: Were you touching her breasts?

Mr. Thomas: Yes.

Sergeant Birch: Were you touching her vagina?

Mr. Thomas: Yes.

Sergeant Birch: Touching her butt?

Mr. Thomas: No.

---

**2.** Throughout the transcription of the interrogation, Sergeant Birch is either referred to as "Detective Burch," "Detective Birch," or his proper title and name, "Sergeant Birch." In the interest of clarity, the correct name is used here.

Sergeant Birch: Okay. When you touched the vagina and the breasts, was it above the clothing?

Mr. Thomas: Yes.

Sergeant Birch: And there were times that it was under the clothing as well, correct?

Mr. Thomas: Yes.

Sergeant Birch: When you touched under the clothing and touched her vagina, other than rubbing, did you make penetration with your fingers?

Mr. Thomas: No.

Sergeant Birch: Just rubbing it with your hands on top of it?

Mr. Thomas: Yes.

Sergeant Birch: How old was she when it first started? Approximately how old was she? Was she developing yet?

Mr. Thomas: A little.

Sergeant Birch: All right. Did she have any pubic hair? I'm trying to get an age.

Mr. Thomas: I don't know.

Sergeant Birch: You don't remember? So it started with the touching?

Mr. Thomas: Yes.

Sergeant Birch: I know it's difficult for you to talk about it. . . .

Mr. Thomas: I mean, I know where this is going.

The questions eventually elicit damning confessions to multiple crimes. As the interaction ended, the officers had Petitioner write and sign a confession. Then, he was arrested.

To me, the moment Petitioner admitted that he touched his daughter inappropriately, the officers no longer had any reason to question the basic truth of the story provided them by the daughter. Thus, the officers had stopped investigating a possible crime and started gathering evidence. Therefore, the moment Petitioner admitted the touching was in his daugh-

ter's "[p]rivate areas," he was in custody and required the safeguards of *Miranda.*

Whether a suspect is in custody is a question of fact, properly decided by the trial court and only disturbed if clearly erroneous. *McAvoy v. State,* 314 Md. 509, 515, 551 A.2d 875, 877–78 (1989) ("Armed with the facts properly found by the trial judge, we must, however, make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody.") (citation omitted). The trial judge here had no difficulty finding that Petitioner was in custody: "This was a custodial interrogation. [N]o reasonable person would have thought they could get up and walk out of that room after they confessed to committing a violent crime."

Also important is the trial judge's determination that the officers were not investigating a crime. Rather, they were gathering evidence to be used against Petitioner. While it appears that the trial judge considered the situation custodial from the moment Petitioner walked into the station, his primary rationale was that Petitioner never felt free to leave: "I don't know of any cases … where a person just gets up and just walks out of a police station or feels that he can. What reasonable person would think that?"

Nothing in the record indicates error in his finding. The Majority finds fault with the trial court for not "follow[ing] the roadmap provided by *Whitfield* [*v. State,* 287 Md. 124, 411 A.2d 415 (1980), *overruled in part by N.Y. v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)] and *Owens* [*v. State,* 399 Md. 388, 924 A.2d 1072 (2007)]." Op. at 261, 55 A.3d at 689. I submit that the trial court did follow the direction established in these cases. When ruling, the trial court explained where and when the interview occurred, how many officers were present, how Petitioner was summoned, how he physically arrived, that Petitioner was being questioned as a suspect, and that he was arrested at the conclusion of the interrogation. These are a majority of the factors listed

in both *Whitfield* and *Owens. See Whitfield,* 287 Md. at 141, 411 A.2d at 425; *Owens,* 399 Md. at 429, 924 A.2d at 1095–97.

The Supreme Court, post-*Miranda,* has worked to clarify the concept and definition of custody. *See, e.g., Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Maryland v. Shatzer,* 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). Accordingly, we have done the same. *See, e.g., Whitfield,* 287 Md. at 124, 411 A.2d at 415; *Wiener v. State,* 290 Md. 425, 430 A.2d 588 (1981); *McAvoy,* 314 Md. at 509, 551 A.2d at 875; *Reynolds v. State,* 327 Md. 494, 610 A.2d 782 (1992); *Owens,* 399 Md. 388, 924 A.2d 1072. The custody analysis requires examination of the circumstances surrounding the interrogation. The ultimate determination of custody depends on whether a reasonable person would feel at liberty to end the interrogation and leave. *E.g., Yarborough,* 541 U.S. at 662, 124 S.Ct. at 2148.

I agree with the trial court and Chief Judge Bell that there was custody, although I disagree that the encounter necessarily began as custodial. I would find that—after Petitioner admitted to inappropriate touching—he could not have felt that he was at liberty to end the interrogation. He was aware that the officers knew the intimate details of his crimes, which were confirmed by his own admissions. He was never told he could leave. His only route of egress was partially blocked by two law enforcement officers. An exterior door was locked with a passkey.

I am not alone in thinking that a police interview that does not start as custodial can end as such. Courts of other jurisdictions have arrived at the same conclusion. For example, the Colorado supreme court has held that a suspect's initially voluntary appearance may become custodial once the suspect no longer feels free to leave. *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972). The defendant in *Algien* was suspected of arson at a construction project where he worked. *Id.* at 3, 501 P.2d 468. At the insistence of his employer, he agreed to go to the police station to take a polygraph test,

which he failed three times. *Id.* at 5, 501 P.2d 468. When a police officer confronted Algien with the test results and questioned him about the incident, Algien broke down and confessed to setting the fire. The trial court found that "the arson investigation ... reached the accusatory stage when Officer Johnson concluded from the polygraph examination that defendant was not telling the truth, at which time the suspicion of guilt focused on him." It was at that moment that Algien's appearance became custodial, and *Miranda* warnings were in order. *Id.* The Supreme Court of Colorado agreed, holding that "[u]nder such compelling circumstances, a reasonable person would with logic conclude that he could not leave the premises of his own free will but would be detained for formal arrest." *Id.* at 7, 501 P.2d 468.

The Indiana Court of Appeals has also observed that a change in the expected subject matter of the interview may trigger a change of voluntary appearance to custody as it "would most probably lead a reasonable person to feel much less likely to be permitted to simply walk out of the police station." *Bean v. State,* 973 N.E.2d 35, 43 (Ind.App.2012). Like Petitioner, defendant Bean believed he was summoned to the police station for one reason, but was questioned about sexual crimes involving his daughter and niece, and was not allowed to return home following confession. *Id.* at 37–39. Although unlike Petitioner, Bean rode to the station with officers and was given notice of his *Miranda* rights, *id.* at 38, other factors were important in the court's custody analysis as well. For instance, the court emphasized the "bait and switch" approach, where the police invited Bean to come to the station to talk about one suspected crime but questioned him instead about a much more serious one. *Id.* at 43. Additionally, like in this case, the questioning was lengthy and ended with an arrest. *Id.* at 43–44. The fact that Bean came to the police station voluntarily and was told more than once that he was free to leave was not determinative.

Another example of a case where a noncustodial event transformed into a custodial interrogation is *State v. Muntean,* 189 Vt. 50, 12 A.3d 518 (2010). Muntean was suspected of

sexually abusing his daughters when they were children and of more recently sexually abusing his grandsons. *Id.* at 520. Exactly as in Petitioner's case, the investigating detective called Muntean and told him he would like to speak with him, but did not tell him the subject matter. *Id.* Muntean drove himself to the station, entered through the lobby, and was escorted into a secured part of the police station, where he was interrogated by a plainclothes officer in a small, windowless room, behind a closed door. *Id.* As here, Muntean was asked if he knew why he was at the station, and answered that he did.[3] *Id.* During a one-hour interview, he continued to deny inappropriate contact with his grandsons but admitted that there had been intimate "touching" of his daughters. *Id.* The Supreme Court of Vermont found that "a reasonable person would not feel at liberty to terminate a police interview **after** being confronted with" evidence of his own guilt. *Id.* at 528 (emphasis added). The court also considered important the isolating nature of the interview, "where defendant was in a secure part of the building and therefore would not have been permitted to walk outside the room freely without police accompaniment." *Id.* at 526. Additionally, the detective never told Muntean that he was free to end the interview at any time. *Id.* The court observed: "the fact that one goes to the police station voluntarily does not necessarily mean that he or she can also leave voluntarily, for at some point the words and conduct of the interrogating officers may transform that which once was a noncustodial, 'voluntary' event into a custodial interrogation." *Id.* (internal quotation marks and citation omitted). Because Muntean's freedom of movement was "curtailed to the degree of formal arrest for effectively the entire interview, and a reasonable person in [that] situation would not have felt free to discontinue the questioning, the detective was obligated" to provide *Miranda* warnings. *Id.* at 529 (citation omitted). Therefore, the suppression of the statements by the lower court was affirmed.

---

**3.** Unlike here, defendant mentioned the need to have a lawyer before answering questions and asked about his *Miranda* rights. *State v. Muntean*, 189 Vt. 50, 12 A.3d 518, 521 (2010).

The same should occur here, but only as to the statements Petitioner made after first admitting he had "touched" his daughter inappropriately. The accusations being leveled against Petitioner by his young daughter were of a grave nature. Young children, by their very substance, are wildly imaginative and can be ignorant of the consequences of their actions. It was the police officers's responsibility to determine if there was truth to the daughter's story. Once Petitioner began corroborating the details given to police by his daughter—that he had touched his daughter criminally, starting in Georgia—then he was in custody, and *Miranda* warnings were necessary.

Although the overarching test of custody is the totality of the circumstances, the following factors can be used to aid in determining whether or not a suspect is in *Miranda* custody in Maryland:

(1) the location and duration of the session, (2) how many police were present, (3) what was said and done, (4) whether the defendant was placed under actual physical restraint or whether there were "things equivalent" to actual restraint, such as drawn weapons or a guard at the door, (5) the manner in which the defendant arrived at the interview, and (6) whether he was detained or arrested or, instead, permitted to leave after the interview.

*Clark v. State*, 140 Md.App. 540, 569, 781 A.2d 913, 930 (2001) (citing *Whitfield*, 287 Md. at 141, 411 A.2d at 425). "All of these factors are relevant to ascertaining the determinative factor, i.e., whether the defendant, as a reasonable person, would have felt free to break off the questioning." *Id.*

In Petitioner's case, these factors would indicate custody. The officers took Petitioner through a locked door at a police station and into an examination room. They suggested to Petitioner that they believed he was guilty of the crimes and that his daughter had provided them with details.[4] A reason-

---

4. Once Petitioner told the officers that he knew he was there to discuss his daughter, Detective Thorpe said "I did speak with [her]. And she

able person in Petitioner's position would perceive that his freedom to leave the station was curtailed. When we add Petitioner's admission to the officers that he touched his daughter inappropriately, we could not expect Petitioner to believe he could just walk out of the door, even with the minimal physical restraint present. The confrontation by the officers with the details of his crime, the questioning that lasted for an hour, and the overall sense of defeat pervading the entire interaction support the trial court's conclusion that Petitioner was not going to be leaving the police station under his own volition.

To be sure, not all interviews conducted at police stations are automatically custodial and require *Miranda* warnings. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). But when a suspect, who is never told he is free to leave, begins detailing his involvement in a series of heinous crimes at the prompting of officers, is encouraged to write and sign a confession, and is then arrested on the spot, he is in custody and requires *Miranda* protections.

Accordingly, I would reverse the Court of Special Appeals and remand the case to the Circuit Court for Montgomery County for further proceedings, at which Petitioner's statements following the words "private areas" would be suppressed.

---

told me about some things that have been going on for quite some time between you and her. You want me to tell you what she told me?" (Tr. 5, 1–4)