*Terrance J. Brown v. State of Maryland*, No. 64, September Term, 2015. Opinion by Hotten, J.

**CRIMINAL PROCEDURE — FIFTH AMENDMENT — ENTITLEMENT TO *MIRANDA* WARNINGS — DETERMINATION OF CUSTODY FOR PURPOSES OF *MIRANDA*:** The Court of Appeals determined Petitioner was in custody for *Miranda* purposes when: (1) Petitioner was approached by detective during early morning hours at the hospital where Petitioner was being treated for multiple gunshot wounds; (2) detective told Petitioner that detective's purpose in coming to the hospital was to "obtain" Petitioner; (3) detective transported Petitioner from the hospital directly to the police station where Petitioner was interrogated; (4) Petitioner was told by detective that Petitioner's car had been seized by police because of dried blood found in the car; (5) Petitioner was escorted directly to second floor of police department into an isolated interrogation room upon his arrival at the police station; (6) Petitioner was transported in rear seat of a marked police cruiser; (7) Petitioner was wearing hospital garb with his head still bandaged during the interrogation; and (8) Petitioner was formally arrested following the interrogation. Based on these facts, a reasonable person in Petitioner's position would not have felt at liberty to terminate the interrogation and leave. The totality of the circumstances of Petitioner's interrogation demonstrated that the restraint on Petitioner's freedom of movement was to the degree associated with a formal arrest. Thus, the trial court properly granted Petitioner's motion to suppress his statements.

Circuit Court for Dorchester County
Criminal Case No. 09-K-14-015442
Argued: March 31, 2016
Reargued: October 13, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 64

September Term, 2015

_____

TERRANCE J. BROWN

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
*Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Hotten,

JJ.

_____

Opinion by Hotten, J.
Barbera, C.J. and McDonald, J., dissent.

_____

Filed: March 27, 2017

*Battaglia, J., now retired, participated in the
initial hearing and conference of the case while
an active member of this Court; after being
recalled pursuant to Md. Constitution, Article
IV, Section 3A, she also participated in the
rehearing, decision, and adoption of this opinion.

The case at bar is an interlocutory appeal filed by the State[1] from an Order in the Circuit Court for Dorchester County, granting Terrance J. Brown's motion to suppress statements obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966). The Court of Special Appeals, in an unreported opinion, reversed. We granted Brown's petition for writ of certiorari, and after briefing and argument, ordered that this matter be remanded, without affirmance or reversal, to the suppression court for the sole purpose of the entry of findings of fact on the issue of custody. After receipt of the suppression court's findings, supplemental briefing, and reargument, we consider one question—whether Brown was in custody for *Miranda* purposes during the interrogation that took place at the Cambridge Police Department before Brown was provided with *Miranda* warnings. We shall hold that a reasonable person in Brown's circumstances would not have felt free to terminate the interrogation and leave. The totality of the circumstances demonstrated that the restraint on Brown's freedom of movement was to the degree associated with a formal arrest. Further, Brown was subjected to an environment that contained the inherently compelling pressures of custodial interrogation, which powered the Supreme Court's decision in *Miranda*. Thus, Brown was in custody for purposes of *Miranda* during the time period at issue. The trial court properly suppressed Brown's statements.

---

[1] *See* Md. Code Ann., Cts. & Jud. Proc. § 12-302(c) (2013 Repl. Vol., 2016 Supp.) (providing for the State's right of appeal from the suppression of evidence, under certain circumstances).

# I. FACTS AND PROCEDURAL HISTORY

Brown was charged with two counts of first-degree murder and related charges in the Circuit Court for Dorchester County. The charges stemmed from a shooting that occurred outside the Elks Lodge in Cambridge, Maryland during the early morning hours of October 5, 2014. Later that day, Brown made statements to police during an interrogation at the Cambridge Police Department. Brown filed a motion to suppress those statements. At the suppression hearing, Trooper Greg Fellon, Detective Edward Howard, and Detective Chris Flynn testified for the State. Brown did not testify and called no witnesses. The factual background that follows is derived from the suppression court's factual findings, together with reference to undisputed evidence presented at the suppression hearing.[2]

During the early morning hours of October 5, 2014, Trooper Fellon was on routine patrol and monitoring radio traffic dispatches. He learned of a reported shooting at the Elks Lodge in Cambridge. At 1:06 a.m., a Dorchester County dispatch broadcasted that an unknown male in an unknown vehicle had called 911. The unknown male stated on the 911 call that he was injured, driving from Cambridge to Hurlock Village Apartments, and

---

[2] The first-level factual findings of the suppression court and the court's conclusions regarding the credibility of testimony must be accepted by this Court unless clearly erroneous. *Thomas v. State*, 429 Md. 246, 259, 55 A.3d 680, 688 (2012). As further outlined herein, after consideration of the briefs, record, and oral arguments in this matter, on April 4, 2016, this Court ordered that this matter be remanded, without affirmance or reversal, to the suppression court for the sole purpose of the entry of findings of fact on the issue of custody.

he "didn't want to go to jail."[3]

Trooper Fellon established an observation position near Hurlock Village Apartments. Trooper Fellon observed "what he believed to be the vehicle of interest[.]" Trooper Fellon observed a man exit that vehicle. After the man left Trooper Fellon's line of vision, Trooper Fellon approached the car and initiated contact with the three remaining passengers in the car. When one of the occupants opened the passenger side door, Trooper Fellon testified that he observed dried blood in the passenger area.

Trooper Fellon asked the occupants about the man who had previously exited the car. Trooper Fellon testified that the occupants replied that they had gone to Cambridge to "pick up T.J. Brown and bring him home to his mother's [house]" in the Hurlock Village complex.

Two additional Maryland State Police Troopers and a Dorchester County Deputy arrived at the scene. Thereafter, Brown's mother drove into the complex. Trooper Fellon requested that she ask her son to come outside to speak with him. She agreed, and Brown came outside. Trooper Fellon observed that Brown was wearing a shirt with blood on it, and he had blood dripping from his earlobe. Brown told Trooper Fellon that "he had been at a party in Cambridge when he heard gunshots. Upon hearing the gunshots . . . he began to duck and run." The police officers summoned emergency medical personnel to the scene. Regarding his observations of Brown's gunshot wounds, Trooper Fellon testified

---

[3] Unless otherwise noted as (1) testimony presented at the suppression hearing or (2) quotations from Detective Flynn's interview of Brown, all quoted factual information is derived from the suppression court's findings of fact.

that Brown "had a nick to his earlobe[,]" "a graze to his shoulder blade area and what appeared to be like a through and through [gunshot wound] on . . . his upper chest."

At approximately 1:55 a.m., Brown was transported from Hurlock to Peninsula Regional Medical Center in Salisbury, Maryland for treatment. The information gained during the course of Trooper Fellon's investigation, including that Brown was struck by gunfire, was communicated to members of the Cambridge Police Department. Trooper Fellon was then advised that the Cambridge Police Department had arranged for a tow truck to pick up Brown's vehicle. Within twenty minutes of Brown's transport to the hospital, the tow truck arrived and removed the vehicle to the police station. "At the request of superiors, Detective Howard of the Cambridge Police Department traveled to Peninsula Regional Medical Center[]" to meet with Brown, who was awaiting discharge.

Detective Howard arrived at the hospital at approximately 5:40 a.m. Detective Howard testified that he "advised [Brown] that the lead investigator Detective Flynn was interested in obtaining his story for his side of the events being he was a victim of that shooting." The suppression court noted that Detective Howard further "advised [Brown] that his purpose [at the hospital] was to 'obtain'" Brown "and ask him if he would consent to coming back" to the Cambridge Police Department "to 'get[]' a statement." Detective Howard's badge and weapon were visible and his gun was secure throughout the interaction.

Detective Howard transported Brown in a marked police car directly from the hospital to the Cambridge Police Department. Brown was seated in the rear passenger

seat. Brown was not handcuffed. He was wearing disposable shirt-and-pants hospital scrubs and boots. His head was bandaged.

The suppression court found that "Detective Howard advised [Brown] numerous times that he was not under arrest, but never advised him that he was free to refuse transportation back to the Cambridge Police Department." The court further stated:

> Although [Brown] acquiesced to traveling back to Cambridge and at no time articulated that he did not want to go, he did express concern about how he would get home, especially after being advised once he was in the police car that his vehicle had been taken to the Cambridge Police Department after Tpr. Fellon found blood in the vehicle. Detective Howard assured [Brown] that the proper arrangements would be made.

Upon arrival at the police department, Detective Howard entered through a door in the north tower located "apart from the entrance for the general public. Detectives Flynn and Curran were waiting for Detective Howard and [Brown] on the second floor." Brown was then taken to an interview/interrogation room. The suppression court described the interview/interrogation room:

> [Brown] was seated in an interview/interrogation room which is located on the second floor of the Cambridge Police Department adjacent to the Criminal Investigation Division office area. The interrogation rooms are equipped with both audio and video recording. . . . The interview room is situated such that there is no view outside of the police headquarters and it is not easy to traverse from that location to the outside without guidance and in some instances the use of electronic access devices.

The door to the interview room was closed except when police personnel entered and exited the room. The suppression court found that "[Brown] was left alone in the room for approximately 15 minutes before Detective Flynn appeared for the interview." Detective Flynn was the sole interviewer. The suppression court noted that "[a]t no time from the

beginning of the interview until [Brown] was told he was being arrested for homicide was he told that he was free to leave." The interview was video-taped and transcribed.

Eventually, Brown was issued *Miranda* warnings and provided a written statement. Relevant here is the exchange between Detective Flynn and Brown that occurred during the approximately six minutes of interrogation[4] that preceded the detective's issuance of *Miranda* warnings.[5]

Detective Flynn began the interrogation by seeking Brown's side of the story:

> Do you know why you're here? Obviously you're here, right? I just got to get your end -- your side of the story of what happened, how you got involved -- do you know what I'm saying -- what went on. So just start (inaudible) -- start at the beginning and walk me through it.

In response, Brown placed himself at the crime scene: "I'm outside chilling outside the Elks." He added that he heard "[a]bout six or seven" shots; the shots were "hitting where [he] was at[]"; and he "got the hell out of there[,]" realizing once he was in his car that he had been shot. Detective Flynn then asked: "So where did you -- which way did you run after this whole thing?" Brown responded: "Well, I was parked -- I ran directly towards

---

[4] The State does not dispute that the statements at issue before us—those that Brown made to Detective Flynn during the six minutes before the detective advised him of his *Miranda* rights—were the product of interrogation. *See Argueta v. State*, 136 Md. App. 273, 284, 764 A.2d 863, 869 (2001) (holding that the test to be applied in determining whether express questioning constitutes an interrogation for *Miranda* purposes is whether the police officer should know that the questioning is reasonably likely to elicit an incriminating response). At issue before us is whether Brown was in custody for purposes of *Miranda* during the six minutes of interrogation preceding the advisement of rights.

[5] The record contains a video recording of the interrogation that reflects the passage of time. We can discern from the video that Detective Flynn issued *Miranda* warnings approximately six minutes into the interrogation.

- 6 -

my car where my car was parked (inaudible) shooting. I was going towards the Legion where the little church is at behind the pool hall." Detective Flynn asked, "So you ran towards Cross Street?" and Brown replied, "Yeah. I got in my car." Detective Flynn asked, "You got in your car, and then you what, drove yourself to Hurlock?" And again Brown responded, "Yeah." Detective Flynn then asked: "And sometime along that [ride] -- did you call the ambulance yourself, or how did that work?" Brown answered, "Yeah. I called them myself because I didn't know if I was going to initially make it to Hurlock."

Detective Flynn testified that, at that point, he viewed Brown as a suspect and decided to issue *Miranda* warnings. When Detective Flynn told Brown that he would be advising him of his rights, Brown asked, "What, I'm under arrest?" and Detective Flynn replied, "No. You're not under arrest." After the warnings were issued, Brown asked multiple times if he could go home and stated that he was tired.

Based on the above, the suppression court made second-level, "[d]ispositional" findings:

> Because [Brown], who at the very least was a person of interest in the homicide, was met by a police officer immediately upon his discharge from the hospital, placed in the backseat of a police car, delivered to police headquarters, placed in an isolated interrogation room on the second floor inside the building and never advised he was free to leave, and had no apparent means to leave, the Court finds that in light of the totality of the circumstances, a reasonable person in [Brown's] position would not have felt at liberty to leave and thus was in custody.

The suppression court did not discredit any part of the detectives' testimony and none of the court's findings of fact depart in any material way from their testimony.

The State appealed the circuit court's grant of Brown's motion to suppress statements. On direct appeal in the Court of Special Appeals, the State argued that the suppression court erred in granting suppression of the statements Brown made to Detective Flynn before the detective advised him of his *Miranda* rights.[6] The State contended that the suppression court had incorrectly determined that, from the outset of the interrogation, Brown was in custody for purposes of *Miranda*. The Court of Special Appeals agreed and reversed the ruling of the suppression court in an unreported opinion.

Brown filed a petition for writ of certiorari, posing the following questions for our review:

> 1. Pursuant to the "supplemental rule of interpretation," where a motions court makes a legal determination, such as finding custodial interrogation took place, without making factual findings, must an appellate court fill in the fact-finding gaps by giving little or no weight to the losing party's evidence, discrediting the losing party's witnesses, and resolving any ambiguities and drawing all inferences in favor of the prevailing party?
>
> 2. In reversing a suppression ruling, may an appellate court rely on a fact on which conflicting evidence was presented below or must the court accept the version of facts most favorable to the prevailing party?
>
> 3. What effect does a motions judge's failure to make factual findings to support its legal conclusion that custodial interrogation took place have on the parameters of the appellate court's review where conflicting versions of events necessitating factual findings were not presented at the motions hearing?
>
> 4. Did the intermediate appellate court err in reversing the motions court's granting of petitioner's suppression motion by finding that petitioner was not

---

[6] As noted, Detective Flynn read Brown the *Miranda* warnings between six and seven minutes into the interrogation. Brown then indicated a desire for counsel. The interrogation did not cease and the court suppressed the statements Brown made during this latter part of the interrogation. The State has not challenged that aspect of the suppression court's ruling.

in custody for purposes of *Miranda* where, after being awake all night, petitioner was taken from the hospital in hospital garb with his head bandaged and complaining of pain from four gunshot wounds directly to the police department by an armed detective who testified that petitioner did not "put up a fight or refuse to come" in the back seat of a marked police car where petitioner was told that his car had been towed to the police station because there was blood in it, petitioner was never told that he was free to leave, he was delivered to a door to the police station that leads directly to an interrogation room with two-way glass rather than through the front door of the station, he was interrogated with an accusatory tone from the outset that leaves no doubt that the detective viewed him as a suspect, and he was arrested at the conclusion of the interrogation?

(footnotes omitted). We granted the petition and agreed to consider all four questions. *Brown v. State*, 445 Md. 125, 126 A.3d 3 (2015).

We considered oral arguments on March 31, 2016. On April 4, 2016, we issued an Order of Remand for the suppression court to render findings of fact regarding whether Brown was in custody for purposes of *Miranda* during the interrogation before Detective Flynn provided Brown with *Miranda* warnings. We also directed the parties to submit supplemental briefs on the custody issue following this Court's receipt of the suppression court's findings of fact. On May 4, 2016, the Circuit Court for Dorchester County issued written findings of fact. The parties filed supplemental briefs in light of those findings, and we heard reargument on October 13, 2016.

Because the suppression court has now issued findings of fact, the first three questions presented, upon which we granted review, are moot. We therefore address only whether Brown was in *Miranda* custody during all or any portion of the six minutes that elapsed between the beginning of the interrogation and the point at which he was given the *Miranda* advisements. For the reasons that follow, we hold that Brown was in custody for

purposes of *Miranda* for the entirety of the interrogation that preceded *Miranda* warnings. Thus, the circuit court did not err in granting Brown's motion to suppress his statements made to police. Accordingly, we reverse the judgment of the Court of Special Appeals.

## II.    STANDARD OF REVIEW

In conducting our review of the suppression court's grant of Brown's motion to suppress, "we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion," here, Brown. *Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238, 1245–46 (2011) (citation omitted). We accept the suppression court's first-level findings unless they are shown to be clearly erroneous. Md. Rule 8-131(c). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *State v. Luckett*, 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010) (citation and quotation marks omitted).

## III.    DISCUSSION

In its seminal decision in *Miranda v. Arizona*, the Supreme Court held that an individual in custody must be informed of certain rights prior to being interrogated so that he or she is not compelled to incriminate himself or herself in violation of the Fifth Amendment. 384 U.S. 436, 467–68, 86 S.Ct. 1602, 1624–25 (1966). The State does not dispute the fact that the statements at issue before us—those that Brown made to Detective Flynn during the six minutes before the detective advised him of his *Miranda* rights—were the product of interrogation. Thus, the issue before this Court is whether Brown was in

- 10 -

custody for purposes of *Miranda* during the interrogation, prior to the detective's advisement of rights.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Dickerson v. U.S.*, the Supreme Court affirmed that *Miranda* is indeed a "constitutional decision," and thus, the enforcement of *Miranda*'s procedural safeguards, which protect the constitutional guarantee, is not merely an exercise of the Supreme Court's "supervisory authority to regulate evidence." 530 U.S. 428, 429–32, 120 S. Ct. 2326, 2329 (2000). The Fifth Amendment is made applicable to the states by incorporation under the Fourteenth Amendment. U.S. CONST. amend. XIV; *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94 (1964). In Maryland, a confession may be admitted against an accused only when it has been "determined that the confession was '(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights,[7] and (3) elicited in conformance with the mandates of *Miranda.*'" *Ball v. State*, 347 Md. 156, 173–74, 699 A.2d 1170, 1178 (1997) (quoting *Hof v. State*, 337 Md. 581, 597–98, 655 A.2d 370, 378 (1995)).

The *Miranda* Court reacted to police interrogation tactics within the "inherently compelling pressures" of custodial police interrogation, which can "undermine the

---

[7] Article 22 of the Declaration of Rights provides "[t]hat no man ought to be compelled to give evidence against himself in a criminal case."

individual's will to resist and . . . compel him to speak where he would not otherwise do so freely." *Id*. at 467, 86 S.Ct. at 1624. The Court recognized that the inherently coercive atmosphere of custodial interrogation "blurs the line between voluntary and involuntary statements[.]" *Dickerson,* 530 U.S. at 435, 120 S.Ct. at 2331. To counteract this risk of compulsion, the Court "adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S. Ct. 2394, 2401, 180 L. Ed. 2d 310 (2011). Prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *see also Vines v. State,* 285 Md. 369, 374, 402 A.2d 900, 903 (1979) (noting that statements obtained from a defendant not advised of *Miranda* warnings must be excluded from evidence if the statements flow from a custodial interrogation within the meaning of *Miranda*).

### A. The definition of custody for purposes of *Miranda*

A determination of whether an individual is in *Miranda* custody is an objective inquiry based on the totality of the circumstances. *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529 (1994); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 1616 (1976). In deciding whether an individual is in custody for purposes of *Miranda*, we must determine, in light of "the objective circumstances of the interrogation," *Stansbury,* 511 U.S. at 323, 114 S.Ct. at 1529, whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516

U.S. 99, 112, 116 S.Ct. 457, 465 (1995). Thus, we determine an individual's freedom of movement objectively in light of the totality of circumstances of the situation, taken as a whole. *See Yarborough v. Alvarado,* 541 U.S. 652, 667, 124 S.Ct. 2140, 2151 (2004); *Stansbury,* 511 U.S. at 322–23, 114 S.Ct. at 1529; *accord Owens v. State*, 399 Md. at 428, 924 A.2d at 1095; *see also Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901, 904 (2003) (stating that a court conducting a "totality of the circumstances" test must not "parse out each individual circumstance for separate consideration[]"). Facts often relevant to our analysis include:

> when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Thomas v. State,* 429 Md. 246, 260–61, 55 A.3d 680, 689 (2012) (citations omitted).

Not all restraints on freedom, however, constitute custody for *Miranda* purposes. *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148 (1984) (declining to grant the freedom of movement test "talismanic power"). Thus, "[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest *or restraint on freedom of movement of the degree associated with a formal arrest.*" *Thompson*, 516 U.S. 99, 112, 116 S. Ct. at 465

(emphasis added) (citations, quotation marks, and brackets omitted). Thus, "the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150. Furthermore, the lodestar of our objective test is whether Brown was subjected to an environment containing the inherently compelling pressures of custodial interrogation, which powered the Court's decision in *Miranda*. *See id*. at 437, 104 S.Ct. at 3148–49 (stating that "[f]idelity to the doctrine announced in [*Miranda*] requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.").

## B. The case at bar

Brown argues that the factual findings rendered by the suppression court fully support the ruling that Brown was in custody for *Miranda* purposes during the interrogation at issue. We agree. A reasonable person in Brown's position would not have felt free to terminate the interrogation and leave. Furthermore, we determine that Brown's freedom was restrained to the degree associated with a formal arrest.

The following facts support this conclusion: Brown was taken to the hospital to treat multiple gunshot wounds; Detective Howard came to the hospital and advised Brown that his purpose in coming to the hospital was to "obtain" Brown; Detective Howard arrived at the hospital to collect Brown at approximately 5:40 a.m.; Detective Howard transported Brown directly from the hospital in hospital garb with his head still bandaged; Brown was transported in the rear seat of a marked police cruiser; Brown was told that his car was towed to the police station because of dried blood on the passenger side; Detective Howard

escorted Brown through the north tower door of the police department, which is located apart from the entrance for the general public; Brown was placed in an isolated interrogation room upon his arrival, where he was subsequently interrogated; and Brown was arrested at the conclusion of the interrogation.

The parties dispute how this Court should review the suppression court's finding that Detective Howard "ask[ed] [Brown] if he would consent to coming back to 'get[]' a statement[]" and, in response, Brown "acquiesced[.]" Brown argues that the suppression court's choice of words reflects that Brown felt compelled to acquiesce in the face of a coercive show of authority. The State counters that the words "consent" and "acquiesce[]" are largely synonymous, and thus, Brown was not compelled to accompany the detective to the police station.

"[W]e view the evidence *and inferences that may be reasonably drawn therefrom* in a light most favorable to the prevailing party on the motion," here, Brown. *Lee*, 418 Md. at 148, 12 A.3d at 1245–46 (2011) (emphasis added) (citation and internal quotation marks omitted). The suppression court's factual finding of "acquiesce[nce]" is substantially different than voluntary agreement, within the totality of the circumstances: the time, place, and manner of the acquiescence. Brown's acquiescence took place early in the morning, at the hospital where Brown was being treated for gunshot wounds, after a visibly armed detective arrived to "obtain" Brown for questioning. Viewed in the light most favorable to Brown, his acquiescence, under the totality of the circumstances, necessarily indicates a lack of voluntariness, or at the very least, an atmosphere of compelling pressure. *See Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624 (providing that the

express purpose of *Miranda*'s safeguards is to combat the "inherently compelling pressures" of custodial interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").

Brown was wearing disposable hospital scrubs when he was escorted from the hospital facility to the police department and subjected to interrogation. This factor tilts the interrogation toward the custodial end of the spectrum. *See Bond v. State*, 142 Md. App. 219, 233, 788 A.2d 705, 713 (2002) (finding custody for purposes of *Miranda* where Bond was interrogated in his bedroom, specifically noting the relevance of the fact that the interrogation took place while Bond was "partially clothed[,]" in a "state of undress[]"). We determine that a reasonable person in Brown's position—an individual in hospital garb, suffering from multiple gunshot wounds, without his or her vehicle—would feel inhibited from simply leaving the presence of the police. Furthermore, these circumstances, taken as a whole, demonstrate that Brown's freedom of movement was curtailed to the degree associated with a formal arrest.

Brown was escorted through the north tower door of the Cambridge Police Department. The suppression court noted that this entrance is "apart from the entrance for the general public."[8] Thereafter, Brown was seated in an interrogation room. The

---

[8] The State argues that this finding is clearly erroneous, as there is no evidence to support the suppression court's finding that the north tower door is apart from the entrance for the general public. Detective Howard, however, testified at the suppression hearing that, upon his arrival with Brown at the Cambridge Police Department, he "responded to the north tower door which in the front parking lot is the main stairwell leading to the second floor of the Police Department where Detective Curran and Detective Flynn were waiting outside." We determine that it is not clearly erroneous for the suppression court to determine that the north tower door is not an entrance used by the general public.

- 16 -

suppression court noted that "[t]he interview room is situated such that there is no view outside of the police headquarters and it is not easy to traverse from that location to the outside without guidance and in some instances the use of electronic access devices."[9] Notably, the *Miranda* Court was specifically concerned about providing procedural safeguards for those who are held incommunicado and cut off from the outside world. *See Miranda*, 384 U.S. at 457–58, 86 S.Ct. at 1619. Of course, simply because a person is interviewed by officers within a police station does not, in and of itself, signify that an individual is in custody for purposes of *Miranda*. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. at 714. It is, nonetheless, yet another factor in support of the ultimate conclusion that Brown was in custody for purposes of *Miranda* during the six minutes of interrogation that occurred prior to *Miranda* warnings in the interrogation/interview room on the second floor of the Cambridge Police Department. *See Miranda*, 384 U.S. at 461, 86 S.Ct. at 1621 (holding that "[a]s a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.").

---

[9] The State contends that the suppression court's finding regarding the layout of the police station was clearly erroneous because there was no evidence to support it. Maryland Rule 5-201(b) allows judges to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." We determine that the layout of a police station in a jurisdiction which seats one circuit court judge falls within the scope of Rule 5-201. *See Abrishamian v. Washington Med. Group*, 216 Md. App. 386, 413–14, 86 A.3d 681, 696–97 (2014) (noting that courts may take judicial notice of categories of "adjudicative facts" "capable of certain verification" that "run the gamut" including facts that are known in the geographic area where the case is pending).

The Supreme Court's analysis in *Howes v. Fields* is instructive and provides contrast to the case at bar regarding the change in circumstances Brown experienced when he was transported to the police station for questioning. In that case, Fields, a state prisoner, was escorted from his prison cell by a corrections officer to a conference room where he was questioned by two policemen about allegations that, before he came to prison, Fields had engaged in sexual conduct with a 12–year–old boy. *Fields*, 565 U.S. at 502, 132 S. Ct. at 1185. Fields was never given *Miranda* warnings. He was questioned between five and seven hours; was told multiple times he was free to leave; the police were armed; Fields was not restrained; the conference room door was sometimes open and sometimes shut; Fields stated multiple times that he no longer wanted to talk to the police but he never asked to go back to his cell; Fields confessed and the interview ended. *Id*. at 503, 132 S. Ct. at 1186. The Court ultimately found that this interrogation was not custodial. *Id*. at 517, 132 S. Ct. at 1194.

The Court emphasized that Fields was already imprisoned when he was taken for questioning. Given the relatively minute change in his physical environment, Fields' situation did not present the same inherently compelling pressures contemplated by the *Miranda* Court:

> A person who is "cut off from his normal life and companions," [*Maryland v. Shatzer*, 559 U.S. 98, 106, 130 S. Ct. 1213, 1220 (2010)], and abruptly transported from the street into a "police-dominated atmosphere," *Miranda,* 384 U.S., at 456, 86 S.Ct. 1602, may feel coerced into answering questions. . . . For a person serving a term of incarceration, we reasoned in *Shatzer,* the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same "inherently compelling pressures" that are often present when a suspect is

yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. *Id*. [at 103, 130 S. Ct.] at 1219.

*Fields*, 565 U.S. at 511, 132 S. Ct. at 1190–91.

Contrastingly, in the case at bar, Brown was not taken from familiar surroundings in the outside world, nor was he already incarcerated at the time of questioning. More surprising than being taken from familiar surroundings, Brown was transported by police in the early morning hours from a hospital where he had been treated for multiple gunshot wounds, after his vehicle had been seized by police as evidence of a crime. Worse than being "cut off from normal life and companions," police transported Brown directly from the hospital, while Brown still wore hospital scrubs, to a police-dominated setting—the interrogation room of a police station. *Shatzer*, 559 U.S. 98, 106, 130 S. Ct. 1213, 1220. This drastic change in circumstances signifies the "inherently coercive pressures" contemplated by the *Miranda* Court. *Fields*, 565 U.S. at 509, 132 S. Ct. at 1190.

Furthermore, *Thomas v. State*, 429 Md. 246, 55 A.3d 680 (2012), presents a factual scenario that is distinguishable from the case at bar. In *Thomas*, this Court looked to the Court of Special Appeals' analysis regarding Thomas' initial confrontation with police, his transportation to the police station, and his ability to leave the station:

> Here, a police officer called [Thomas] and asked if he could "come down to the [police] station," telling him that it had to do with one of his children. [Thomas] agreed and drove himself to the police station. Although the police initiated the contact, the record reflects that the police requested [Thomas]'s presence rather than demanded it, and [Thomas] drove himself to the police station. These facts do not suggest police coercion or restraint. Indeed, by driving himself, [Thomas] had the ability to drive himself home if he had decided to end the interview and leave. The circumstances preceding the interview weigh against a finding of custody.

*Id.* at 262, 55 A.3d at 690 (quoting *State v. Thomas*, 202 Md. App. 545, 570, 33 A.3d 494, 509 (2011)) (internal quotation marks omitted). This Court ultimately affirmed the Court of Special Appeals' determination that Thomas was not in custody for purposes of *Miranda* at the time he made the statements at issue. 429 Md. at 273, 55 A.3d at 697.

*Thomas* is distinguishable from the case at bar for several reasons. First, although both interrogations took place in the stationhouse setting, Thomas' interrogation occurred after police called Thomas and invited him to come to the police station. *Id.* at 262, 55 A.3d at 690 (citing *Thomas*, 202 Md. App. at 570, 33 A.3d at 509). Contrastingly, Brown's interrogation occurred after a detective approached Brown in the early morning hours at the hospital where Brown was treated for multiple gunshot wounds. Rather than receiving an invitation by phone, the detective told Brown that the detective's purpose in coming to the hospital was to "obtain" Brown. Second, we emphasized that Thomas had travelled to the police station "of his own volition[.]" *Id.* at 272, 55 A.3d at 696. Conversely, Brown "acquiesced" to being transported from the hospital to the police station by Detective Howard. As we noted, viewed in the light most favorable to Brown, Brown's acquiescence signifies resistance, and an atmosphere of compulsion. Third, Thomas drove himself to the interrogation. *Id.* at 262, 55 A.3d at 690 (citing *Thomas*, 202 Md. App. at 570, 33 A.3d at 509). Brown was transported by police in the backseat of a police cruiser directly from the police station, while still dressed in hospital garb with his head bandaged. Lastly, in *Thomas*, we looked to the Court of Special Appeals' determination that Thomas was able to drive himself home, if he decided to terminate the interview and leave. *Id.* (citing

*Thomas*, 202 Md. App. at 570, 33 A.3d at 509). Brown was not able to drive himself home from the police station because his car had been seized as evidence of a crime.

The suppression court's finding that Brown was "advised . . . numerous times that he was not under arrest[]" does not alter our ultimate conclusion. We note that the suppression court also found that Brown was not informed, at the outset of the interrogation or at any time thereafter, that he was free to leave or free to terminate the interrogation. In *Buck v. State*, 181 Md. App. 585, 956 A.2d 884 (2008), the Court of Special Appeals analyzed circumstances in which an individual was told by police multiple times that he was "free to leave[.]" *Id*. at 626, 956 A.2d at 908. In one instance, before Buck agreed to accompany the officers to the police station, one of the detectives "told Buck that he would not be under arrest and would be free to leave at any time. [The detective] testified: 'All he had to do was say the word and I would bring him home.'" *Id*. at 598, 956 A.2d at 892. The Court of Special Appeals reasoned that "when a suspect has been told by the police, clearly and unequivocally, that he is not under arrest *and can leave at any time*, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice 'will not carry the day.'" *Id*. at 626, 956 A.2d at 908 (emphasis added) (quoting Wayne LaFave, Criminal Procedure § 66(d), at 737 n. 57 (3d ed. 2007)). The Court of Special Appeals ultimately found "[a] reasonable person in Buck's situation would not think, however, based on the conduct of the officers, that he had the freedom to break off contact with the police." *Id*. at 626, 956 A.2d at 908. Similarly, in the case at bar, based on the conduct of the officers, a reasonable person in Brown's position would not have felt free to break off contact with the police. Further, Brown, unlike Buck, was never told that he

was free to leave, or given the option to break off contact with the police. Given the varying degrees of police interaction with citizens, we determine a statement that one is "not under arrest[]" is inherently more compelling than a statement that one is "free to leave."

Lastly, the fact that Brown was told by police that he was a "victim" does not change our ultimate conclusion. Similar to our analysis regarding the fact that Brown was told that he was "not under arrest," the contemporaneous conduct of the police had the effect of nullifying the notion that Brown was considered as *only* a victim. *See id.* at 626, 956 A.2d at 908. Brown was "obtain[ed]" from a hospital where he was being treated for multiple gunshot wounds, his car was confiscated by police as evidence of a crime, and he was transported by police directly from the hospital to the police station in the early morning hours while he was still wearing hospital garb with his head bandaged. Upon arrival at the police station, he was held in an isolated interview room where he was eventually interrogated. A reasonable person in Brown's position would not feel as though he or she was being considered as *only* a victim within the investigation.

For these reasons, we conclude that Brown was in custody for *Miranda* purposes when he made the statements at issue on appeal. Under the totality of the circumstances, a reasonable person in Brown's position would not have felt at liberty to break off the questioning and leave. Furthermore, there was a restraint on Brown's freedom of movement to the degree associated with a formal arrest. The circumstances in the case at bar presented the same concerns as those that powered the *Miranda* decision. Thus, we hold that the trial court properly granted Brown's motion to suppress his statements.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY DORCHESTER COUNTY.**

Circuit Court for Dorchester County
Criminal Case No. 09-K-14-015442
Argued: March 31, 2016
Reargued: October 13, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 64

September Term, 2015

_____

TERRANCE J. BROWN

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
*Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Hotten,

JJ.

_____

Dissenting Opinion by Barbera, C.J., which
McDonald, J., joins

_____

Filed: March 27, 2017

*Battaglia, J., now retired, participated in the initial hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the rehearing, decision, and adoption of this opinion.

I respectfully dissent. The Court was presented in this case with another opportunity to apply the principles first set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), and developed in the decades since that landmark decision was issued. The Majority concludes that Brown was in custody for *Miranda* purposes. In reaching that conclusion, the Majority relies on the following facts: Brown was taken to the hospital for treatment of multiple gunshot wounds; Detective Howard came to the hospital and advised Brown that he was there to "obtain" him; Detective Howard arrived at the hospital to collect Brown at approximately 5:40 a.m.; Detective Howard transported Brown directly from the hospital in hospital garb with his head still bandaged; Brown was transported in the rear seat of a marked police cruiser; Brown was told that his car was towed to the police station because of dried blood on the passenger side; Detective Howard escorted Brown through an entrance to the police station that is located apart from the entrance for the general public; Brown was placed in an isolated interrogation room upon his arrival; and Brown was arrested at the conclusion of the interrogation.

The Majority reaches this conclusion by placing great weight on those facts, many of which do not strongly favor *Miranda* custody, while de-emphasizing or omitting other facts that, taken together with the facts the Majority highlights, should lead to a conclusion that Brown was not in *Miranda* custody. Those facts include that Detective Howard told Brown that he was going to the police station to give a statement as a "victim"; Brown was not handcuffed; Detective Howard repeatedly assured Brown that he was not under arrest; Brown slept during the ride and appeared to be in only "a little bit of pain"; Detective Howard told Brown, in response to Brown's expressed concern about getting himself

home, that proper arrangements would be made; Brown was not restrained at any time before or during the interrogation; he remained alone in the interview room for only fifteen minutes before the interrogation began; the sole interrogator, Detective Flynn, was dressed in plain clothes and was not armed; and Brown gave the statements at issue during the first six minutes of the interrogation. I am of the opinion that the Supreme Court's *Miranda* jurisprudence, to which this Court is bound, compels a different conclusion than that which the Majority reaches today. Adherence to the custody analysis as developed by the Supreme Court in the cases following *Miranda* leads me to conclude that Brown was not in *Miranda* custody at the time he made the statements that are at issue in this appeal.

I

"The *Miranda* decision is grounded in that portion of the Fifth Amendment to the Constitution that provides: 'No person . . . shall be compelled in any criminal case to be a witness against himself.'"[1] *Lee v. State*, 418 Md. 136, 149 (2011). The *Miranda* Court, "intent on 'giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow,'" implemented "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Florida v. Powell*, 559 U.S. 50, 59 (2010) (alteration in original) (citations omitted); *see also Lee*, 418 Md. at 149 ("One of the Court's stated aims in establishing the *Miranda* rule [was] to 'assure that the individual's right to choose

---

[1] This provision of the Fifth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

between silence and speech remains unfettered throughout the interrogation process.'") (citation omitted).

"The prophylactic measures developed in *Miranda* took the form of the now-familiar warnings that law enforcement personnel must deliver to a suspect before undertaking any custodial interrogation." *State v. Luckett*, 413 Md. 360, 377 (2010). Among the warnings are that a person subject to a custodial interrogation must be advised of his right to remain silent, that his statements may be used against him, and that he has a right to counsel. *Id.* at 377-78 (citing *Miranda*, 384 U.S. at 479). Important for present purposes is the requirement that those warnings be given when a defendant is subject to a "custodial interrogation."

The *Miranda* Court held that the now-well-known warnings are to precede "custodial interrogation," by which the Court meant, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The *Miranda* Court did not define what, in this context, "custody" means. The Supreme Court, however, has done so since then. "As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

Determining custody is a multi-step process. As the Majority recognizes, "the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (citations omitted). Yet, that determination is not the

3

end of the analysis. "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. . . . 'Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.'" *Id.* (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)); *accord Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

*Miranda* custody, moreover, is measured in light of "all of the circumstances surrounding the interrogation," *Fields*, 565 U.S. at 509 (citation omitted), and "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances," *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). This test does *not* take into account how much the police know about the person being interrogated; those circumstances are irrelevant to the *Miranda* custody inquiry. *See Beheler*, 463 U.S. at 1125. Likewise irrelevant are the subjective beliefs of either the officer(s) conducting the interrogation or the person being interrogated. *Stansbury v. California*, 511 U.S. 318, 324-25 (1994) (per curiam).

II

*Brown was not in* Miranda *custody at the time he made the statements that are at issue in this appeal.*

The Majority places much stock in the court's use of the word "acquiesced" rather than "consented" in describing Brown's response at the hospital to Detective Howard's

4

request that he "consent to coming back" to the police station to give a statement. The Majority concludes that, "in the light most favorable to Brown, his acquiescence, under the totality of the circumstances, necessarily indicates a lack of voluntariness, or at the very least, an atmosphere of compelling pressure." Maj. Slip Op. at 15. As support for this conclusion, the Majority points out that Detective Howard arrived at the hospital in the early morning hours, was visibly armed, and told Brown that he had been directed to "obtain" Brown for questioning. *Id.* The Majority also emphasizes that Brown was dressed in disposable hospital scrubs and suffering from multiple gunshot wounds, and was without his vehicle. *Id.* at 16.

I would not attach the same significance that the Majority does to the suppression court's use of the word "acquiesced" in describing Brown's response to Detective Howard's request that he "consent to coming back" to the police station. Even viewed in the light most favorable to Brown, it is too much an inferential stretch to conclude, from the suppression court's use of the word, that the court must have found as a fact that Brown went against his will with Detective Howard to the police station. Neither do other facts to which the Majority points—the detective's use of the word "obtain" and Brown's inability to access his vehicle—dictate a different conclusion. We consider those facts, as we must, in conjunction with the facts that Detective Howard told Brown that he was going to the police station to give a statement as a "victim"; Brown was not handcuffed; Detective Howard repeatedly assured Brown that he was not under arrest; Brown slept during the

5

ride and appeared to be in only "a little bit of pain";[2] and, in response to his expressed concern about getting himself home, the detective told Brown that proper arrangements would be made. Further, I am of the opinion that Brown's attire, consisting of disposable shirt-and-pants hospital scrubs and boots, does not rise to the level of the "state of undress" discussed in *Bond v. State*, upon which the Majority relies. Maj. Slip Op. at 16; *see Bond v. State*, 142 Md. App. 219, 234 (2002) (concluding that the defendant was in *Miranda* custody in part because he was "questioned late at night, in bed, undressed, by three officers blocking the bedroom door").

The Majority properly recognizes that police questioning at a station house does not automatically render an individual in *Miranda* custody. Maj. Slip Op. at 17; *see Mathiason*, 429 U.S. at 495. The Majority states, however, that Brown's being transported directly from the hospital to the police station constitutes a "drastic change in circumstances" signifying the "inherently coercive pressures" *Miranda* was designed to protect against. Maj. Slip Op. at 19 (citing *Fields*, 565 U.S. at 509). Although being transported from a hospital to the police station is indeed more of a "sharp" change of circumstances than in *Fields*, 565 U.S. at 511, where the defendant was questioned while already serving a prison term, I would not place as much weight on this fact as does the Majority. Indeed, Brown's being transported directly from the hospital to the police station must be considered in combination with the surrounding circumstances. *See Thomas v. State*, 429 Md. 246, 260 (2012) ("A court . . . does not parse out individual aspects so that

---

[2] Because Brown did not testify at the suppression hearing, we have only the detective's assessment of Brown's level of pain.

6

each circumstance is treated as its own totality in the application of the law."). Brown was told that Detective Flynn wanted to get "his story for his side of the events being he was a victim of that shooting" and was assured that proper arrangements would be made for his transportation home. This interaction was entirely consistent with the police officers' treatment of Brown as a shooting victim from the moment Trooper Fellon met him at the apartment complex up to and inclusive of the first six minutes of the interrogation, which is the portion of the interrogation that concerns us. A reasonable person, under the same circumstances, would not feel effectively under arrest and unable to terminate the encounter.

Moreover, even if Brown felt he was not free to decline the detective's request, that fact alone, or in combination with other facts, viewed in the light most favorable to Brown, does not demonstrate that he was subject to the "'restraint on freedom of movement' of the degree associated with a formal arrest" that is the hallmark of *Miranda* custody. *Beheler*, 463 U.S. at 1125 (quoting *Mathiason*, 429 U.S. at 495); *accord Berkemer v. McCarty*, 468 U.S. 420, 440-42 (1984) (not every restraint on movement or nonconsensual encounter with the police constitutes *Miranda* custody).

My assessment does not change with the addition of the remaining facts leading up to and including what occurred during the first six minutes of the interrogation. I consider that Brown entered the police station through an entrance not used by the general public; he and Detective Howard were met by Detective Flynn and a second officer; the interview room was located in an area of the police station inaccessible to the public; and the interview room was windowless and the door to it closed. I also take into account that

7

Brown was not restrained at any time before or during the interrogation; he remained alone in the interview room for only fifteen minutes before the interrogation began; the sole interrogator, Detective Flynn, was dressed in plain clothes and was not armed; and Brown gave the statements at issue during the first six minutes of the interrogation. Viewed in their totality, these facts would not lead a reasonable person in Brown's position to consider himself effectively under arrest.

The Majority cites *Buck v. State*, 181 Md. App. 585, 626 (2008), for the proposition that, "when a suspect has been told by the police, clearly and unequivocally, that he is not under arrest *and can leave at any time*, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice 'will not carry the day.'" Maj. Slip Op. at 21. According to the Majority, the "contemporaneous conduct of the police had the effect of nullifying the notion that Brown was considered as *only* a victim." *Id.* at 22. In *Buck*, an officer stated, in Buck's presence, "I think we got him." 181 Md. App. at 597. The next day, officers took Buck in a police cruiser to the police station, where the interrogation lasted about five hours. *Id.* at 598-99. Despite being told that he was not under arrest and was free to leave, "Buck was asked accusatory questions, was told his house was being searched for evidence in the . . . murder," and he gave a DNA sample. *Id.* at 626. The Court of Special Appeals in *Buck* concluded that the officers' conduct had the effect of "nullifying" the officers' statements that Buck was not under arrest and was free to leave largely because the officers communicated to Buck that he was a suspect in the investigation. *See id.* at 622, 626.

8

Unlike in *Buck*, the record in the case before us gives no indication that the officers ever communicated to Brown that he was a suspect. Brown acknowledges that the suppression court made no explicit finding on this score. The most the suppression court made of the evidence was that, at the time Detective Howard met Brown at the hospital, he was "at the very least a person of interest in the homicide" and "early in the investigation," Brown's vehicle was referred to as the "suspect" vehicle. For purposes of the custody analysis, however, when or how the police came to refer to the "suspect" vehicle is of no consequence given there is no indication that the reference was conveyed to Brown. Added to those facts are the facts that Detective Howard asked Brown to accompany him to the police station to make a statement "as a victim," repeatedly told Brown that he was not under arrest, and assured Brown that "proper arrangements" would be made for his travel home. The questions Detective Flynn posed to Brown during the first six minutes of the interrogation were not accusatory in content. Moreover, the suppression court, which had the benefit of an audio and video recording of the interrogation, did not find that Detective Flynn used an accusatory tone in questioning Brown or employed any other intimidating tactics during those six minutes.

The Majority suggests that the interrogation here was even more custodial than in *Buck* because, unlike Buck, Brown was not informed at the outset of the interrogation or at any time thereafter that he was free to leave or free to terminate the interrogation. Maj. Slip Op. at 21-22. Tellingly, the Majority does not follow that assertion with a citation to authority suggesting that the absence of such information indicates *Miranda* custody, and we know of none. *See Thomas*, 429 Md. at 272 (concluding that, "although the police

9

never uttered the talismanic words 'you are free to go,'" Thomas was not in custody for *Miranda* purposes and the circuit court judge erred in granting the motion to suppress); *cf. Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding, in the Fourth Amendment context, that a defendant need not be informed that he is "free to go" for his consent to search to be considered voluntary).

In the end, the facts should not compel the conclusion that Brown was in *Miranda* custody during the first six minutes of the interrogation. *Beheler, supra*, 463 U.S. at 1121, is materially the same as this case and informs my conclusion. As here, the question before the Supreme Court was whether Beheler was in *Miranda* custody when he gave a statement in response to police questioning. *Id.* Like Brown, Beheler was interrogated at the police station soon after the crime occurred. *Id.* at 1124. Like Brown, Beheler was told he was not under arrest and "agreed" (in the words of the Supreme Court) to accompany the police to the stationhouse. *Id.* at 1122. Beheler had been drinking earlier that day, and was emotionally distraught at the time of the interrogation. *Id.* at 1124-25. Brown, though evidently not "distraught," complained to Detective Howard of being in "a little bit of pain from the gunshot wounds, but other than that he seemed fine." *See United States v. Infante*, 701 F.3d 386, 397-98 (1st Cir. 2012) (concluding that Infante was not in custody when he was interrogated in the hospital following medical treatment and noting that, "[d]espite having received pain medication, Infante was coherent and responsive, showing no sign of mental impairment"), *cert. denied*, 133 S. Ct. 2841 (2013). Beheler had been drinking; Brown, who Detective Flynn said smelled of alcohol, might have imbibed earlier that night, but according to the detective did not appear to be intoxicated. The *Beheler* Court

10

concluded that, taken together, the facts of that case did *not* amount to *Miranda* custody. 463 U.S. at 1125. *See also Spencer v. United States*, 132 A.3d 1163, 1168-69 (D.C. 2016) (holding that a defendant questioned at a police station was not in custody for *Miranda* purposes where the defendant was taken to the police station in the back of a police car, was never left alone but was "never handcuffed or restrained in any way," was frisked by the police officer, and was told that he was not under arrest).

In sum, the circumstances, taken together, lead me to conclude that Brown was not in *Miranda* custody at the time he made the statements that are at issue in this appeal. I would therefore affirm the judgment of the Court of Special Appeals, which came to the same conclusion.

Judge McDonald has authorized me to state that he joins this dissent.